[No. A130413. First Dist., Div. Four. May 29, 2012.]

TYLER MIXON, a Minor, etc., et al., Plaintiffs and Appellants, v. PACIFIC GAS & ELECTRIC COMPANY, Defendant and Respondent.

[No. A131474. First Dist., Div. Four. May 29, 2012.]

TYLER MIXON, a Minor, etc., et al., Plaintiffs and Appellants, v. DEPARTMENT OF TRANSPORTATION, Defendant and Respondent.

126

COUNSEL

Jay-Allen Eisen Law, Jay-Allen Eisen, Aaron S. McKinney; Mastagni, Holstedt, Amick, Miller & Johnsen, David P. Mastagni and William Manuel Briggs for Plaintiffs and Appellants.

Janssen, Malloy, Michael William Morrison and Amelia F. Burroughs for Defendant and Respondent Pacific Gas & Electric Company.

Ronald W. Beals, David Gossage, Lucille Baca, Karl H. Schmidt, Landa S. Low and Stacy Jayne Lau for Defendant and Respondent California Department of Transportation.

## OPINION

**SEPULVEDA, J.**[*]—A motorist struck and injured a boy walking with his family in a marked crosswalk. The injured boy and his siblings sued the motorist and others for personal injury and emotional distress. This appeal concerns claims against California's Department of Transportation (State) and Pacific Gas & Electric Company (PG&E).

Plaintiffs sued the State upon allegations that it maintained the street intersection in a dangerous condition (Gov. Code, § 835), and faulted the lighting configuration, lack of traffic control signals and signs, placement of signs, the type of crosswalk markings, and the grade of the intersection. Plaintiffs sued PG&E for allegedly failing to provide adequate lighting with overhead streetlights.

The trial court granted the State and PG&E summary judgment. The court found that the intersection was not in a dangerous condition and that there was no duty to provide lighting. Plaintiffs filed separate notices of appeal for the State and PG&E. We consolidated the appeals for purposes of briefing, argument, and decision. We now affirm the judgments.

## I. FACTS

On the evening of February 14, 2006, a father and his three children were walking across a street in a marked crosswalk when a motorist failed to yield to the pedestrians and struck one of the children. The father, Jeremy Mills, had taken his eight-year-old daughter Gabrielle Mills and four-year-old twin sons Tyler and Adam Mixon to a Valentine's Day dinner. The family was walking home around 7:40 p.m. when they reached the intersection of 3rd and R Streets in the City of Eureka. The intersection has a marked crosswalk but no signal lights and no streetlights directly overhead.

The father told the police that the family stopped on the southeast corner of 3rd and R Streets and waited for traffic on R Street to stop before entering the crosswalk. A northbound car stopped and Jeremy Mills and his children entered the intersection together in front of the stopped car. The family started across R Street from east to west. One southbound car passed as they started to cross the street and another southbound vehicle, a pickup truck driven by Nicholas Harris, approached the crosswalk as the family was walking across the street. Mills realized that the pickup truck was not going to stop and reached for his children. His son Tyler was walking ahead, and

---

[*]Retired Associate Justice of the Court of Appeal, First Appellate District, Division 4, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

the pickup truck struck the boy. Tyler was thrown 80 feet and struck his head on the roadway when he landed. The boy suffered brain damage, broken bones, hearing loss, and other disabling injuries. The driver, Harris, told the police: "I was going 35 to 40 [miles per hour]. The last thing I saw was someone's headlights. Then I saw him, he was in the crosswalk. There was a guy to the left maybe his dad. I didn't even have time to hit the brakes."

## II.  DISCUSSION

The question on appeal is whether the State and PG&E contributed to Tyler Mixon's tragic accident. The trial court said no and granted summary judgment to the State and PG&E. The court concluded that the State's public street intersection was not in a dangerous condition that endangered pedestrians and that PG&E had no duty to provide lighting at the intersection with overhead streetlights. We turn to a consideration of the law and evidence relevant to these issues.[1]

### A.  *Standard of review*

"A motion for summary judgment 'shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' (Code Civ. Proc., § 437c, subd. (c).) In considering a request for summary judgment by a defendant, the statute instructs that such a party 'has met his or her burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete defense to that cause of action. Once the defendant . . . has met that burden, the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto.' (Code Civ. Proc., § 437c, subd. (p)(2).) An appellate court reviews de novo a trial court's decision to grant a summary judgment motion." (*Cerna v. City of Oakland* (2008) 161 Cal.App.4th 1340, 1346 [75 Cal.Rptr.3d 168] (*Cerna*).)

### B.  *General principles concerning a dangerous condition of public property*

Government Code section 835 provides that a public entity is "liable for injury caused by a dangerous condition of its property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind

---

[1] The State also moved for summary judgment based on design immunity. (Gov. Code, § 830.6.) The trial court did not reach that issue and neither do we.

of injury which was incurred, and either: [¶] (a) A negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or [¶] (b) The public entity had actual or constructive notice of the dangerous condition . . . a sufficient time prior to the injury to have taken measures to protect against the dangerous condition."

The element at issue here is the existence of a dangerous condition. A " '[d]angerous condition' " is defined as "a condition of property that creates a substantial (as distinguished from a minor, trivial or insignificant) risk of injury when such property . . . is used with due care in a manner in which it is reasonably foreseeable that it will be used." (Gov. Code, § 830, subd. (a).) "The existence of a dangerous condition is ordinarily a question of fact but 'can be decided as a matter of law if reasonable minds can come to only one conclusion.' " (*Cerna, supra,* 161 Cal.App.4th at p. 1347.)

" '[A] claim alleging a dangerous condition may not rely on generalized allegations [citation] but must specify in what manner the condition constituted a dangerous condition.' [Citation.] A plaintiff's allegations, and ultimately the evidence, must establish a physical deficiency in the property itself. [Citations.] A dangerous condition exists when public property 'is physically damaged, deteriorated, or defective in such a way as to foreseeably endanger those using the property itself,' or possesses physical characteristics in its design, location, features or relationship to its surroundings that endanger users." (*Cerna, supra,* 161 Cal.App.4th at pp. 1347–1348, italics omitted.) "A public entity may be liable for a dangerous condition of public property even where the immediate cause of a plaintiff's injury is a third party's negligent or illegal act," like a motorist's negligent driving, "if some physical characteristic of the property exposes its users to increased danger from third party negligence or criminality. [Citation.] But it is insufficient to show only harmful third party conduct, like the conduct of a motorist. ' "[T]hird party conduct by itself, unrelated to the condition of the property, does not constitute a 'dangerous condition' for which a public entity may be held liable." ' [Citation.] There must be a defect in the physical condition of the property and that defect must have some causal relationship to the third party conduct that injures the plaintiff. [Citation.] '[P]ublic liability lies under [Government Code] section 835 only when a feature of the public property has "increased or intensified" the danger to users from third party conduct.' " (*Id.* at p. 1348.)

C. *The intersection was not in a dangerous condition*

The motorist, Harris, traveled along State Route 255 from Arcata to Eureka before reaching the intersection that is the site of the accident at issue here.

State Route 255 crosses Arcata Bay on the Samoa Bridge and ends in Eureka, with State Route 255 becoming R Street. When approaching Eureka, a driver on State Route 255 passes a traffic sign stating "30 ZONE AHEAD," then a sign depicting a traffic signal light and the words "SIGNAL AHEAD" painted on the roadway. Next, a "SPEED LIMIT 30" sign is posted and, soon after, a sign stating "END FREEWAY" appears. State Route 255 becomes R Street. Farther along, "SIGNAL AHEAD" is written in the roadway and a driver comes to the R Street intersection with 3rd Street. The intersection is painted with white crosswalk markings on the north side first encountered, then the south side. Harris struck plaintiff Mixon while the boy was walking with his family in the south crosswalk. A block beyond the site of the accident at 3rd Street is 4th Street, and the location of the indicated signal light.

■ Plaintiffs identify five features that allegedly made the intersection of 3rd and R Streets dangerous: (1) dim lighting at 3rd and R Streets with brighter lighting before and after it; (2) lack of a traffic control signal at 3rd Street; (3) lack of pedestrian crossing warning signs at 3rd Street and the presence of signal-ahead signs for the 4th Street intersection that comes after 3rd Street; (4) parallel line crosswalk markings instead of zebra stripes or more visible patterns; and (5) a dip in the grade of the intersection. None of these features, considered alone or in combination, creates a substantial risk of injury when the intersection is used by pedestrians and motorists with due care. (Gov. Code, § 830, subd. (a).)

1. *Lighting*

Plaintiffs allege that the lighting at the site of the accident at the 3rd and R Streets intersection was inadequate and made especially dangerous because the poorly lit intersection contrasted sharply with better lit areas surrounding it. It is undisputed that there was no streetlight directly above the intersection. The nearest street light was on 3rd Street, about 29 feet from the intersection. Nearby areas were more brightly lit. The police report of the accident notes that the Samoa Bridge on State Route 255 on which Harris traveled has overhead lights illuminating the span of the bridge and that the 4th and R Street intersection a block beyond the site of the accident has overhead streetlights and business lights that illuminate the area. In opposition to the motion for summary judgment, an electrical engineer and lighting expert retained by plaintiffs declared: "The fact that there were lighted areas surrounding the relatively dark subject accident intersection made it harder for a driver coming southbound off the Samoa Bridge on SR-255 to perceive pedestrians at the subject intersection than would have been the case if none of the areas, not the Samoa Bridge and neither the 3rd nor 4th Street intersection had been lighted. It was the bright lighting on the Samoa Bridge

and at the 4th Street intersection which made the relatively dark intersection at 3rd Street a more severe problem and greater danger to persons using the intersection."

■ Plaintiffs' argument is a variant of the claim that a public entity is negligent for failing to provide streetlights—a claim that has long been rejected. A public entity is under no duty to light its streets. (*Antenor v. City of Los Angeles* (1985) 174 Cal.App.3d 477, 483 [220 Cal.Rptr. 181] (*Antenor*).) " 'In the absence of a statutory or charter provision to the contrary, it is generally held that a municipality is under no duty to light its streets even though it is given the power to do so, and hence, that its failure to light them is not actionable negligence, and will not render it liable in damages to a traveler who is injured solely by reason thereof.' " (*Ibid.*; see 40 Am.Jur.2d Highways, § 425, p. 126.) A duty to light, "and the consequent liability for failure to do so," may arise only if there is "some peculiar condition rendering lighting necessary in order to make the streets safe for travel." (*Antenor, supra*, at p. 483.) In other words, a prior dangerous condition may require street lighting or other means to lessen the danger but the absence of street lighting is itself not a dangerous condition.

Several cases are instructive. In *Antenor*, two pedestrians struck by a motorist while crossing a city street claimed the intersection was in a dangerous condition because, among other things, the street lighting was too dim. (*Antenor, supra*, 174 Cal.App.3d at pp. 479, 480, 483.) The trial court granted a directed verdict to the city and the Court of Appeal affirmed. (*Id.* at pp. 479, 485.) The Court of Appeal acknowledged evidence that the lighting intensity was below government guidelines but found that the city had no duty "to light its streets in the first instance" and thus was not negligent for failing to provide brighter lights. (*Id.* at p. 483.)

In *Plattner v. City of Riverside* (1999) 69 Cal.App.4th 1441, 1443 [82 Cal.Rptr.2d 211], a pedestrian was struck by a motorist in a dark crosswalk with a nonfunctioning city streetlight. Summary judgment for the city was affirmed because the city had "no duty to provide street lighting and, therefore, ha[d] no duty to maintain that lighting, even at a crosswalk." (*Ibid.*) The court stated: "Plaintiff does not claim and consequently has not shown there was anything dangerous about the crosswalk other than the absence of light. But darkness is a naturally occurring condition that the city is under no duty to eliminate. Thus, the fortuity of locating the streetlight at a spot where it illuminates the crosswalk does not render the crosswalk dangerous without the light. [¶] Nor do we share plaintiff's view that by providing a crosswalk and thereby encouraging pedestrians to cross the street at that location the city invited the public to rely on the streetlight and thus created a duty to maintain the light." (*Id.* at p. 1445.) The court rejected the plaintiff's reliance

argument by noting that "it is obvious to all when a streetlight is out. Therefore, a pedestrian such as plaintiff cannot claim she relied on the inoperative streetlight in order to cross the street. Moreover, unlike traffic lights and stop signs which are the only means by which traffic is controlled, streetlights are not the only or even the primary means by which streets are illuminated for vehicular traffic. Vehicle headlamps are designed and used for that purpose." (*Id.* at p. 1446.)

In *City of San Diego v. Superior Court* (2006) 137 Cal.App.4th 21, 23 [40 Cal.Rptr.3d 26], the appellate court directed the trial court to grant summary judgment to a city charged with maintaining a dangerous condition on its streets. A vehicle passenger was injured, and others killed, in a collision with a motorist participating in street racing. (*Ibid.*) The plaintiffs claimed the city street used for racing was dangerous because "the posted speed limit is 50 miles per hour and there are no traffic controls, speed bumps or natural conditions that deter street racing" and "[t]he length of road on which the races occur is poorly lighted at night," which makes it difficult for drivers to "see or gauge the speed of approaching racers." (*Id.* at p. 24.) The court rejected the claim. On the lighting issue, the court noted that there was no "showing of previous accidents caused by poor lighting" and thus no showing of any physical defect in the condition of property creating a duty to provide lighting. (*Id.* at p. 31.) Since there was no duty to provide lighting, there was no negligence in failing to provide brighter lighting.

In this case, plaintiffs argue that even if the State had no duty to provide lighting, it may be held liable because it undertook to provide lighting and did so negligently by lighting the surrounding areas more brightly than the 3rd and R Streets intersection. As noted at the outset of this discussion, plaintiffs' argument is no more than a variant of the long-rejected claim that a public entity is negligent for failing to provide streetlights. Plaintiffs try to contrast their argument as one faulting "the lighting configuration" and "lighting scheme" at the intersection rather than one faulting the lack of lighting, but it all amounts to the same thing. The alleged defect in "the lighting configuration" is that the areas before and after the intersection were more brightly lit, making the intersection a more difficult to perceive "black hole," according to plaintiffs. The only cure for such a defect is more lighting at the intersection as it is impractical to darken the surrounding areas. The area before the subject 3rd Street intersection is a bridge span that rises above Arcata Bay and the area after the 3rd Street intersection is a busy street that is lit not only by streetlights but by private business lights. The lighting configuration at the subject intersection and surrounding area is not unlike many urban areas where there are numerous light sources, public and private, and gradations of light intensity. A public entity, which has no general duty to light its streets, cannot be held liable for failing to provide a consistent level of lighting between one street and the next.

## 2. *Traffic control signal*

■   Plaintiffs contend that other features apart from dim lighting made the 3rd and R Streets intersection dangerous and point to the lack of a traffic control signal. But the Legislature has expressly declared that "[a] condition is not a dangerous condition . . . merely because of the failure to provide regulatory traffic control signals, stop signs, yield right-of-way signs, or speed restriction signs, as described by the Vehicle Code, or distinctive roadway markings [of parallel dividing lines] as described in Section 21460 of the Vehicle Code." (Gov. Code, § 830.4.) "Thus, the statutory scheme precludes a plaintiff from imposing liability on a public entity for creating a dangerous condition merely because it did not install the described traffic control devices." (*Brenner v. City of El Cajon* (2003) 113 Cal.App.4th 434, 439 [6 Cal.Rptr.3d 316].) In short, "[t]he lack of a traffic signal at the intersection does not constitute proof of a dangerous condition." (*Cerna, supra*, 161 Cal.App.4th at p. 1351.)

It is true, as plaintiffs note, that a public entity may be liable where a dangerous condition "exists for reasons *other than or in addition to* the 'mere[]' failure to provide such controls or markings." (*Washington v. City and County of San Francisco* (1990) 219 Cal.App.3d 1531, 1536 [269 Cal.Rptr. 58, original italics].) Sight restrictions caused by metal pillars in the street and an overhead freeway may combine with the absence of regulatory traffic devices to create a dangerous condition, for example. (*Id.* at p. 1535.) Here, there are no additional features to combine with the lack of a traffic control signal to make the 3rd and R Streets intersection dangerous, as further discussion reveals.

## 3. *Warning signs*

■   Among the features offered by plaintiffs as elements that combined to create a dangerous condition are the lack of a pedestrian crossing sign at 3rd Street and the presence of an assertedly distracting signal ahead sign and roadway marking for the 4th Street intersection. As with regulatory traffic control devices, there are limitations to liability based on traffic warning signs. "Neither a public entity nor a public employee is liable . . . for an injury caused by the failure to provide traffic or warning signals, signs, markings or devices described in the Vehicle Code. Nothing in this section exonerates a public entity or public employee from liability for injury proximately caused by such failure if a signal, sign, marking or device (other than one described in [Government Code] Section 830.4) was necessary to warn of a dangerous condition which endangered the safe movement of traffic and which would not be reasonably apparent to, and would not have been anticipated by, a person exercising due care." (Gov. Code, § 830.8.) In other

words, a concealed dangerous condition that is a trap to motorists or pedestrians may require the posting of a warning sign but the absence of a warning sign itself is not a dangerous condition. (*Moritz v. City of Santa Clara* (1970) 8 Cal.App.3d 573, 576 [87 Cal.Rptr. 675]; *Hilts v. County of Solano* (1968) 265 Cal.App.2d 161, 174 [71 Cal.Rptr. 275].) Therefore, the absence of a pedestrian crossing sign at the 3rd and R Streets intersection does not prove a dangerous condition.

The presence of a signal-ahead sign and roadway marking also fails to prove a dangerous condition. The sign and marking were accurate in warning drivers of a signal light at 4th and R Streets and were reasonably placed to fulfill their purpose of providing drivers with sufficient time to slow their speed and to prepare for a possible stop in traffic as they exited the freeway and entered the city streets of Eureka. Plaintiffs complain that the signal-ahead sign directed drivers' attention to the intersection beyond 3rd Street and distracted them from focusing on the 3rd Street intersection preceding 4th Street and its signal light. But every warning sign necessarily directs a driver's attention to one thing among multiple things. An accurate, reasonably placed warning sign does not create a dangerous condition just because it focuses a driver's attention on one roadway feature among many. It remains the driver's duty to attend to the roadway as a whole.

### 4. *Crosswalk marking*

The crosswalk at 3rd and R Streets was marked with white parallel lines. Plaintiffs argue that the State used a "minimalist approach to delineating the crosswalk" that was less visible than alternate forms such as the "zebra stripe," "piano key," or "ladder" paint patterns. It may be that these alternate patterns can be perceived at a greater distance than the pattern used, as plaintiffs' expert opines, but this does nothing to prove liability. A public entity may be held liable if its property is in a *dangerous* condition. (Gov. Code, § 835.) A public entity is not required to go beyond the elimination of danger and maximize every safety precaution. There is no evidence that the crosswalk pattern used, although perhaps not the safest possible, created a dangerous condition. "[D]rivers of vehicles are required to yield the right-of-way to pedestrians in any marked crosswalk." (*Cerna, supra,* 161 Cal.App.4th at p. 1351.) With that point in mind, we noted in a previous case that a crosswalk painted white instead of yellow is not a significant difference that will support a finding that an intersection is in a dangerous condition. (*Ibid.*) Similarly, we conclude here that the fact that a crosswalk is painted with parallel lines rather than with a zebra stripe, piano key, or ladder pattern is "of such a minor, trivial or insignificant nature in view of the surrounding circumstances that no reasonable person would conclude that the condition created a substantial risk of injury." (Gov. Code, § 830.2.)

### 5. *Road grade*

As noted earlier, the motorist, Harris, traveled along State Route 255. State Route 255 crosses Arcata Bay on the Samoa Bridge and ends in Eureka, with State Route 255 becoming R Street. State Route 255 has a 5 percent downgrade from the apex of the southernmost span of Samoa Bridge to just north of the 3rd and R Streets intersection. There is then a 1.88 percent upgrade as R Street approaches and crosses 3rd Street and continues on to 4th Street.

■ Plaintiffs argue that the downgrade from Samoa Bridge to the 3rd and R Streets intersection followed up the upgrade to 4th Street created " 'a dip or hollow' " at 3rd and R Streets that impaired the visibility of the crosswalk, especially when combined with the "minimalist approach" to marking the crosswalk with painted parallel lines rather than a more prominent pattern. The argument is not supported by the evidence. The less than 2 percent grade change at the location of the accident is slight and photographs show that the intersection's crosswalk markings are visible when approached from the Samoa Bridge. Moreover, it is undisputed that the intersection is visible to a southbound driver for 520 feet, which exceeds state standards. There are roadway design standards for "minimum stopping sight distance," which is defined as "the distance required by the driver of a vehicle traveling at a given speed to bring his vehicle to a stop after an object on the road becomes visible." The current standards require that for a design speed of 30 miles per hour (the speed limit here) that the stopping sight distance be 200 feet. A design speed of 55 miles per hour requires a stopping sight distance of 438 feet. The stopping sight distance at the subject intersection is 520 feet, greater than the stopping sight distance required for both the posted road speed of 30 miles per hour and a greater speed of travel. Plaintiffs concede the point but try to qualify the concession by arguing that the *daytime* stopping distance for the intersection is 520 feet as opposed, presumably, to the nighttime stopping distance. The fact remains, however, that the asserted road dip is not a significant obstruction if the intersection is visible from 520 feet, whether day or night. The implied suggestion by plaintiffs that the intersection is less visible at night does not prove a dangerous condition. Many, if not most, street intersections are less visible at night than by day. Absent a duty to eliminate darkness—which, as discussed above, a public entity does not have—diminished visibility that comes with nightfall is not evidence of a dangerous condition subjecting a public entity to liability.

■ Plaintiffs point out, correctly, that a dangerous condition of public property may be based on a combination of factors. (*Salas v. Department of Transportation* (2011) 198 Cal.App.4th 1058, 1069 [129 Cal.Rptr.3d 690].) The evidence presented here, however, fails to raise a triable issue of fact on

the element of a dangerous condition of property whether the factors are considered alone or in combination. Plaintiffs argue to the contrary and proffer evidence that the overall accident rate at the subject intersection was greater than the statewide average. However, "[i]t is well settled that before evidence of previous accidents may be admitted to prove the existence of a dangerous condition, it must first be shown that the conditions under which the alleged previous accidents occurred were the same or substantially similar to the one in question." (*Id.* at p. 1072.) Moreover, "[w]hile there must be substantial similarity to offer other accident evidence for any purpose, a stricter degree of substantial similarity is required when other accident evidence is offered to show a dangerous condition; ' "the other accident must be connected in some way with that thing . . . ." ' " (*Ibid.*)

Plaintiffs' evidence of previous accidents concerns dissimilar accidents involving, for the most part, broadside vehicle-to-vehicle collisions arising from 3rd Street motorists making a left turn onto R Street and failing to yield to R Street traffic. In the eight years preceding motorist Harris's collision with the pedestrian, Tyler Mixon, there was only one vehicle and pedestrian accident in the subject intersection, and it occurred in daylight. That accident occurred around 9:00 a.m. on January 22, 2003, three years before the accident at issue here. An eastbound driver on 3rd Street stopped at the stop sign and made a left turn into the intersection, striking a pedestrian in the northernmost crosswalk crossing from west to east. The pedestrian died from his injuries. Unlike Harris, the motorist in the 2003 accident was not traveling southbound on R Street but was entering R Street from 3rd Street, and the collision occurred in the northbound not southbound crosswalk. The only other vehicle and pedestrian accident in the area was a 1997 accident that happened on R Street 47 feet south of the 3rd Street intersection when a drunk pedestrian abruptly stepped off the sidewalk in front of a moving car. These dissimilar accidents provide no evidence of a dangerous condition. Even if the one vehicle and pedestrian accident at the 3rd and R Streets intersection that happened in 2003 is considered sufficiently similar to warrant consideration, it does not prove a dangerous condition, given the high traffic volume that has passed through the intersection without incident. It is undisputed that the traffic volume at the subject accident location was between 7,700 and 9,500 vehicles per day for both directions of travel, which amounts to 2.8 to 3.5 million vehicles per year. In the five years before Tyler Mixon was injured, over 7.8 million vehicles traveled southbound through the 3rd and R Streets intersection, with only one vehicle to pedestrian accident occurring. The evidence does not show that the intersection was in a dangerous condition.

## D. *PG&E is not liable for failing to provide brighter streetlights*

Plaintiffs sued PG&E for allegedly failing to provide adequate lighting with overhead streetlights. Plaintiffs faulted PG&E for placing a "small wattage" streetlight about 29 feet from the 3rd and R Streets intersection, which plaintiffs say lighted the fronts and backs of pedestrians but not the sides of pedestrians as they crossed in front of southbound R Street drivers. PG&E claims that public entities like the State determine the placement and amount of roadway lighting in California, not PG&E. Plaintiffs dispute that claim. More broadly, PG&E also claims that a public utility like itself has no legal duty to provide lighting for roadway travelers, and thus may not be held liable for its alleged failure to provide brighter lighting. The trial court granted PG&E summary judgment, finding "no duty on a public utility to provide lighting." The court was correct.

As discussed above, a public entity is under no duty to light its streets. (*Antenor, supra,* 174 Cal.App.3d at p. 483.) " 'In the absence of a statutory or charter provision to the contrary, it is generally held that a municipality is under no duty to light its streets even though it is given the power to do so, and hence, that its failure to light them is not actionable negligence, and will not render it liable in damages to a traveler who is injured solely by reason thereof.' " (*Ibid.*)

A public utility, like PG&E, cannot be charged with greater liability than the public entity itself in this regard. (*White v. Southern Cal. Edison Co.* (1994) 25 Cal.App.4th 442, 452 [30 Cal.Rptr.2d 431] (*White*).) In *White*, the plaintiff was injured when his moped collided with a van in a dark intersection near an inoperative streetlight owned and maintained by a public utility company. (*Id.* at pp. 445–446.) The trial court found that the utility company had no duty to maintain the streetlight in an operable condition and granted the company's motion for summary judgment. (*Id.* at p. 446.) The Second District Court of Appeal affirmed. (*Id.* at p. 454.) The appellate court noted the well-established rule that public entities are generally not liable to a traveler injured by inadequate street lighting and extended the rule to public utilities. (*Id.* at pp. 451–452.)

The *White* court held that "liability may not be imposed on a public utility in these circumstances where (1) the installation of the streetlight is not necessary to obviate a dangerous condition, i.e., there is a duty to install the streetlight and a concomitant duty to maintain it; (2) the failure to maintain an installed streetlight does not create a risk greater than the risk created by the total absence of a streetlight; and (3) the injured party has not in some manner relied on the operation of the streetlight foregoing other protective actions, e.g., a pedestrian chooses a particular route home in reliance on the

available streetlighting when the pedestrian would have chosen a different route or a different means of transportation in the absence of lighting." (*White, supra*, 25 Cal.App.4th at p. 451.)

The evidence here fails to raise a triable issue of material fact on any of the points stated in *White, supra*, 25 Cal.App.4th at page 451. Installation of the streetlight was not necessary to obviate a prior dangerous condition, the low wattage streetlight did not create a risk greater than the risk posed by the total absence of a streetlight, and plaintiffs did not forgo other protective actions in reliance on the streetlight. Plaintiffs argue that they did rely on the streetlight, specifically "that the manner in which PG&E provid[ed] lighting gave pedestrians using the crosswalk [the] false impression that they were visible to drivers on the roadway." But the brightness of the streetlight was a fixed intensity and apparent to all observers—the streetlight did not suddenly dim as plaintiffs crossed the street. The trial court properly entered summary judgment for PG&E.

## III.   DISPOSITION

The judgments are affirmed.

Ruvolo, P. J., and Rivera, J., concurred.