Filed 08/23/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CYNTHIA HUERTA, et al., | |
| Plaintiffs and Appellants, | G056076 |
| v. | (Super. Ct. No. 30-2015-00823806) |
| CITY OF SANTA ANA, | O P I N I O N |
| Defendant and Respondent. | |

Appeal from a judgment of the Superior Court of Orange County, Glenn Salter, Judge. Affirmed.

DiMarco Araujo Montevideo, Brooke L. Bove and John A. Montevideo for Plaintiffs and Appellants.

Carpenter, Rothans & Dumont, Justin Reade Sarno and Steven J. Rothans, for Defendant and Respondent.

\* \* \*

Cynthia Huerta, Maria De Jesus Gonzalez and Andres Gonzalez are the parents of three girls who were tragically killed on Halloween night in 2014 when they were struck by a speeding motorist while they were crossing the street in a marked crosswalk. The driver fled the scene. He was later arrested and pleaded guilty to felony vehicular manslaughter.

Huerta and the Gonzalezes sued the City of Santa Ana (the City), alleging a cause of action for damages based on a claim that the crosswalk constituted a "dangerous condition of public property" pursuant to Government Code sections 835 and 835.2.[1] They contend the trial court erred by granting summary judgment in favor of the City, arguing there were triable issues of fact related to whether the crosswalk qualified as "a dangerous condition of public property" and whether the City had notice of that dangerous condition before this accident.

While it has long been the law that, in the absence of a statute or charter provision to the contrary, a city has no duty to light its streets, an exception to that rule may exist if a "'peculiar condition'" of the property makes lighting necessary. (*Antenor v. City of Los Angeles* (1985) 174 Cal.App.3d 477, 483 (*Antenor*).) Huerta and the Gonzalezes assert that a large tree adjacent to the north end of the crosswalk, in conjunction with a nearby street light, caused a shadow to be cast over the crosswalk making it unreasonably dark at night. As a result, they argue their children were rendered invisible to any approaching driver—thereby creating a "peculiar condition" that qualifies as an exception to the *Antenor* rule, thus requiring additional lighting in the crosswalk. They also argue the crosswalk constituted a "dangerous condition of public property" because the posted speed limit in the area was too high for the nighttime conditions.

_____

[1] All further statutory references are to the Government Code, unless otherwise indicated.

2

For reasons discussed below, we disagree with both contentions. After scrutinizing these facts, we cannot find a "dangerous condition of public property" or any "peculiar condition" that would trigger an obligation by the City to modify its street lighting at the accident scene. Moreover, as the trial court observed in granting the City's motion for summary judgment, it is undisputed that the driver who hit the girls was exceeding the posted speed limit, and therefore the speed limit was not a proximate cause of these tragic deaths. We therefore must affirm the judgment.

**FACTS**

On Halloween night in 2014, Huerta's daughters, Lexi Perez-Huerta and Lexandra Perez-Huerta, and the Gonzalezes' daughter, Andrea Gonzalez, were all struck and killed by a car while crossing Fairhaven Avenue in a marked crosswalk. The speeding driver who killed the girls later admitted he was criminally reckless when he pleaded guilty to three counts of felony vehicular manslaughter involving "gross negligence."

1. *The Intersection*

Fairhaven is a two-way, four-lane street that runs east-west. The accident occurred at the "T" intersection where Old Grand Street meets Fairhaven from the south. The marked crosswalk bisects Fairhaven from the southeast corner of the intersection to the northern side of Fairhaven. There is an elementary school at the northern end of the crosswalk, where a large tree grows between the street and the school.

The posted speed limit for that section of Fairhaven is generally 45 miles per hour, but it is reduced to 25 miles per hour when children are present. There are several signs along the northern (westbound) side of Fairhaven, alerting approaching cars to the existence of the upcoming crosswalk; these warnings begin approximately 630 feet east of the crosswalk. During school hours, the crosswalk is monitored by a crossing guard.

3

At night, the intersection is illuminated by a single street light at the southeast corner of Fairhaven and Old Grand, near the south end of the crosswalk. The next closest street light is on the south side of Fairhaven, approximately 230 feet west of the intersection. In their complaint, Huerta and the Gonzalezes assert that on the night of the accident, "the intersection was 'pitch black' at the subject crosswalk."

The civil engineering expert retained by Huerta and the Gonzalezes stated in a declaration filed with the court that the night time lighting at the intersection—as measured two years after the accident in November 2016—was "dim." Directly below the one street light at the southeast corner the light level was according to the expert significantly below what would be "expected." The expert also stated that the north end of the crosswalk, farthest away from the street light, was the "dimmest" part of the crosswalk. There is a large tree on the north side of Fairhaven that overhangs the right lane of Fairhaven (the number two westbound lane) where the crosswalk terminates in front of the school.

2.    *The Accident*

The three girls were all wearing black clothing on Halloween. At approximately 6:45 p.m. that evening, they entered the crosswalk at the southern end where the street light is located, and began to cross Fairhaven northbound toward the school. A westbound vehicle, preparing to turn left onto Old Grand Avenue, yielded for them in the westbound left turn lane.[2] Moments after they passed in front of that stopped

---

[2]     Huerta and the Gonzalezes emphasize that the driver who had stopped at the crosswalk for the girls was preparing to make a left turn, claiming "it would be reasonable for a[nother] motorist [i.e., Bell] to presume the car is waiting for oncoming traffic to pass before he turns left," rather than yielding to pedestrians in the crosswalk. They suggest this fact made the stopped vehicle "less suspicious than if a car had been stopped at the crosswalk in the regular lanes of traffic." They identify no evidence to suggest there was oncoming traffic close enough to impede the stopped vehicle from making a safe left turn. We note the girls had time to safely cross the eastbound lanes of Fairhaven just moments before passing in front of the stopped vehicle in the westbound

4

car, Jaquinn Ramone Bell, driving at a speed somewhere between 50 and 70 miles per hour in the westbound number two lane, struck and killed all three girls. The accident was captured on the adjacent school's surveillance video.[3] There is no evidence Bell attempted to stop before hitting the girls. Bell fled the scene, but he was apprehended two days later following an investigation and manhunt.

Huerta and the Gonzalezes sued Bell, the City of Santa Ana, and the Orange Unified School District. As against the City, they alleged a single cause of action for damages based on the theory that the crosswalk qualified as a "dangerous condition of public property" pursuant to section 835.

In August of 2017, following extensive discovery, the City moved for summary judgment, or alternatively for summary adjudication, of the following five issues: (1) it was entitled to design immunity pursuant to section 830.6; (2) the intersection of Fairhaven and Old Grand Street does not constitute "a dangerous condition of public property" as defined by sections 830 and 835; (3) there is no evidence the City had actual or constructive notice of a dangerous condition at the intersection of Fairhaven and Old Grand Street; (4) Bell's criminally negligent driving, amounting to felony vehicular manslaughter, was the proximate cause of Huerta and the Gonzalezes' injuries; and (5) to the extent there is any dangerous condition at the intersection, it constitutes a trivial defect pursuant to section 830.2, and is otherwise foreclosed by sections 830.4 and 830.8.

left turn lane, which raises the inference the stopped car was yielding to them rather than to any approaching traffic.

[3]     The estimate of Bell's speed generated by the Santa Ana Police Department, whose officers conducted videotaped test runs and compared them to the surveillance footage of the accident, was between 65 and 70. Huerta and the Gonzalezes disputed that speed estimate, pointing to the testimony of an eyewitness who estimated Bell was driving "about 50 miles an hour." Either way, it is undisputed Bell was driving in excess of the posted speed limit at the time of the accident.

In granting the motion for summary judgment, the trial court focused largely on the second and third issues raised by the City. The court found the City had met its burden of showing there was no dangerous condition involving the crosswalk by "provid[ing] evidence that there were no peculiar conditions of the road at this location: The crosswalk was clearly marked, the street is level and straight, there are no sight obstructions, the crosswalk is clearly marked in advance both by parkway signage as well as street lettering, and the accident data showed no accidents involving pedestrians in the eight years preceding this accident." The court also noted the City provided authority demonstrating "it could not be held liable for a dangerous condition based on the absence of lighting because a city has no duty to install lighting. (*Antenor v. City of Los Angeles* (1985) 174 Cal.App.3d 477, 483.)"

The court rejected the assertion that the posted speed limit on Fairhaven was too high for night-time driving because drivers might "'outdrive' their headlights" at that speed, reasoning that "[t]he posted speed limit is simply the maximum speed a driver may drive at any time. A driver must still adhere to the basic speed law which prohibits driving at a speed which endangers people or property. (See Veh. Code, § 22350.) A driver who proceeds at a speed that 'outdrives' his or her headlights is not obeying the basic speed law and is not using the public street in a safe and reasonable manner, even if the posted speed limit is higher." The court also concluded the asserted impropriety of the posted speed limit was not the proximate cause of the accident because "[i]t is undisputed that Bell was not driving the posted speed limit, but far above it."

**DISCUSSION**

1. *Standards Applicable to Summary Judgment*

"A motion for summary judgment should be granted if the submitted papers show that 'there is no triable issue as to any material fact,' and that the moving party is entitled to judgment as a matter of law. [Citation.] A defendant moving for summary

judgment meets his burden of showing that a cause of action has no merit if he shows that one or more elements of the cause of action cannot be established, or that there is a complete defense. [Citation.]  Once the defendant has met that burden, the burden shifts to the plaintiff to show that a triable issue of material fact exists." (*Myers v. Trendwest Resorts, Inc*. (2007) 148 Cal.App.4th 1403, 1409.)

"There is a genuine issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof. Initially, the moving party bears a burden of production to make a prima facie showing of the nonexistence of any genuine issue of material fact. If he carries his burden of production, he causes a shift: the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a genuine issue of material fact." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 845.)

"On appeal after a motion for summary judgment has been granted, we review the record de novo, considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334.)  "In performing our de novo review, we must view the evidence in a light favorable to plaintiff as the losing party [citation], liberally construing her evidentiary submission while strictly scrutinizing defendants' own showing, and resolving any evidentiary doubts or ambiguities in plaintiff's favor." (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768.)

Under this de novo standard, "the trial court's stated reasons for granting summary judgment 'are not binding on us because we review its ruling, not its rationale.'" (*Johnson v. Open Door Community Health Centers* (2017) 15 Cal.App.5th 153, 157.)  We will affirm the summary judgment if correct on any of the grounds asserted in the motion.  (*American Meat Institute v. Leeman* (2009) 180 Cal.App.4th 728, 747-748.)

## 2. *Background Law*

Generally speaking "[a] public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person." (§ 815, subd. (a).) An exception to this general rule is created by section 835, which provides that "a public entity is liable for injury caused by a dangerous condition of its property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either: [¶] (a) A negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or [¶] (b) The public entity had actual or constructive notice of the dangerous condition under Section 835.2 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition."

The term "dangerous condition" is defined in section 830, subdivision (a) (section 830(a)), which states: "'Dangerous condition' means a condition of property that creates a substantial (as distinguished from a minor, trivial or insignificant) risk of injury when such property or adjacent property is used with due care in a manner in which it is reasonably foreseeable that it will be used."

When it comes to public roadways, "a public entity is only required to provide roads that are safe for reasonably foreseeable careful use." (*Chowdhury v. City of Los Angeles* (1995) 38 Cal.App.4th 1187, 1196.) "[P]ublic liability lies under section 835 only when a feature of a public property has 'increased or intensified' the danger to users from third party conduct." (*Bonanno v. Central Contra Costa Transit Authority* (2003) 30 Cal.4th 139, 155.)

"'[A] claim alleging a dangerous condition may not rely on generalized allegations [citation] but must specify in what manner the condition constituted a dangerous condition.' [Citation.] A plaintiff's allegations, and ultimately the evidence,

8

must establish a *physical* deficiency in the property itself. [Citations.] A dangerous condition exists when public property 'is physically damaged, deteriorated, or defective in such a way as to foreseeably endanger those using the property itself,' or possesses physical characteristics in its design, location, features or relationship to its surroundings that endanger users." (*Cerna v. City of Oakland* (2008) 161 Cal.App.4th 1340, 1347-1348.)

3.      *The Claim of Dangerous Condition*

For over three decades, *Antenor* has been the leading case on a California city's obligation to light its roadways.  The *Antenor* court determined "'[i]n the absence of a statutory or charter provision to the contrary, it is generally held that a municipality is under no duty to light its streets even though it is given the power to do so, and hence, that its failure to light them is not actionable negligence, and will not render it liable in damages to a traveler who is injured solely by reason thereof.'"  The court, however, added that "'[a] duty to light, and the consequent liability for failure to do so,'" may arise if there is "'some peculiar condition rendering lighting necessary in order to make the streets safe for travel.'" (*Antenor, supra*, 174 Cal.App.3d at p. 483.)

Although Huerta and the Gonzalezes suggest the authority cited in *Antenor* provides an unconvincing foundation for the rule stated, they also acknowledge the rule has been consistently cited and applied in many other cases alleging dangerous conditions of public property (see, e.g., *Mixon v. Pacific Gas & Electric Co.* (2012) 207 Cal.App.4th 124 (*Mixon*); and *Plattner v. City of Riverside* (1999) (69 Cal.App.4th 1441).  Until oral argument, they did not seem to dispute application of the *Antenor* rule here.  Instead, they focused on the fact that *Antenor* creates an exception to the rule in cases where a "peculiar condition" makes lighting necessary.[4]

---

[4]     At oral argument Huerta and the Gonzalezes' counsel at least impliedly asked us to reconsider and disagree with *Antenor* and its progeny.  We decline to do so as imposing a duty on cities to light their streets implicates a host of public policy issues

9

Huerta and the Gonzalezes assert that the tree located at the north end of the crosswalk (whose branches extended out over the number two lane of westbound Fairhaven) created just such a "peculiar condition" that made the crosswalk especially dangerous. Specifically, they contend the tree branches overhanging the street "cast[] a large, dark shadow over the north end of the crosswalk, further reducing illumination of pedestrians" in the crosswalk. In support of this allegation, they point to the declaration of their "human factors" expert who concluded, "[a] large tree immediately north of the crosswalk further shades the northern portion of the crosswalk from any ambient illumination."

While that statement may be true in the abstract—especially during daylight hours—we cannot see how the tree at issue could have cast a material shadow on the night of the accident. The single street light at the intersection was located at the opposite end of the crosswalk. On a dark night, the street light could only have caused the tree to cast its shadow away from the street toward the school. That light could not have created a shadow over the area of impact of this accident.

The civil engineering expert hired by Huerta and the Gonzalezes declared that "it is clear from the data that the tree had the effect of reducing the lighting levels along the north side of Fairhaven Avenue at the north end of the crosswalk." However,

_____

(e.g., public safety, cost, and potential light pollution). The parties addressed none of these issues in their briefing. Given the many competing considerations involved, we conclude the Legislature is best suited to determine whether, and to what extent, cities should be compelled to light their streets at night.

We believe this conclusion is supported by the rationale underlying the often-related design immunity defense discussed in *Higgins v. State of California* (1997) 54 Cal.App.4th 177: """"Basically, this defense is predicated upon the concept of separation of powers—that is, the judicial branch through court or jury should not review the discretionary decisions of legislative or executive bodies, to avoid the danger of 'impolitic interference with the freedom of decision-making by those public officials in whom the function of making such decisions has been vested. . . .'""" (*Id.* at p. 185.)

10

the expert does not relate that opinion to conditions on the night of the accident, when the sole source of illumination for the intersection was the fixed street light on the opposite corner.[5] Nor does the expert quantify the extent to which the lighting in the crosswalk might have been reduced by the tree, as opposed to other factors such as the gradual diminution of the street light's impact as distance from that light source increased.

Ultimately, the facts relied upon by Huerta and the Gonzalezes and their experts indicate that the crosswalk was "darkest at the north end . . . ." That assertion is consistent with the uncontested fact the sole source of illumination for the intersection is the street light located at the opposite end of the crosswalk. It does not support an inference that the tree exacerbated the darkness factor at the point of impact. Nor is there any evidence that tree branches physically blocked the driver's view of the crosswalk or any person in it. We therefore cannot find that the presence of the tree at the north end of the crosswalk raises a question of fact related to the existence of a "peculiar condition" that might necessitate lighting under *Antenor*.[6]

We conclude this case is virtually indistinguishable from *Mixon* where, as here, a child was killed crossing a street in a marked crosswalk in the evening. Although both a northbound car and a southbound car had already stopped for the child and his family in the crosswalk, a second southbound vehicle drove through the crosswalk

---

[5] There is no evidence that the intersection was illuminated by moonlight on the night of the accident; to the contrary, Huerta and the Gonzalezes contend it was "'pitch black'" that night.

[6] The dissent suggests our analysis improperly resolves disputed issues of fact that should be resolved at trial. But such disputes will justify a trial only if the issues are material in determining potential liability. In our view, disputes about the relative light levels at various points in the crosswalk, and their possible effect on visibility, are not material in light of *Antenor* and its progeny. Thus, it is on the law, not the facts, that we differ.

11

without stopping and killed the child before his father could pull him out of the way. (*Mixon, supra,* 207 Cal.App.4th at pp. 129-130.)

The issue presented to the *Mixon* court was remarkably similar to the issue now before us: "In this case, plaintiffs argue that even if the State had no duty to provide lighting, it may be held liable because it undertook to provide lighting and did so negligently by lighting the surrounding areas more brightly than the 3rd and R Streets intersection." (*Mixon, supra*, 207 Cal.App.4th at p. 134.) After rejecting plaintiffs' position, the court explained its ruling: "The lighting configuration at the subject intersection and surrounding area is not unlike many urban areas where there are numerous light sources, public and private, and gradations of light intensity. A public entity, which has no general duty to light its streets, cannot be held liable for failing to provide a consistent level of lighting between one street and the next." (*Ibid.*)

Huerta and the Gonzalezes argue the crosswalk constituted a "dangerous condition of public property" because it was not lit equally at both ends, and the relative darkness caused by the tree at the north end created a "peculiar condition" that made it especially difficult for drivers in the number two lane to see a northbound pedestrian. We cannot agree. The physical layout of the intersection here, considering the relative positions of the street light, the crosswalk, and the involved tree, does not support either the "dangerous condition" or the "peculiar condition" argument.

Finally, Huerta and the Gonzalezes suggest the trial court also erred by rejecting their assertion that the 45-mile per hour posted speed limit created a dangerous condition at the crosswalk at night because a driver at that speed would "'outdrive' their headlights" and be unable to see pedestrians in the crosswalk in time to stop. In rejecting that assertion, the trial court relied upon the "basic speed law" found in Vehicle Code section 22350, which states that "No person shall drive a vehicle upon a highway at a speed greater than is reasonable or prudent having due regard for weather, visibility, the traffic on, and the surface and width of, the highway, and in no event at a speed which

12

endangers the safety of persons or property." The court reasoned that if, as Huerta and the Gonzalezes suggest, a driver going 45 miles per hour would not be able to see whether there were pedestrians in the crosswalk (which he knew he was approaching due to signage) in time to stop, he was obligated to slow down.

We agree. The basic speed law does not automatically permit a driver to drive at the posted speed limit. If the conditions—including visibility or lack thereof—are such that driving at the posted speed limit prevents drivers from seeing pedestrians in a crosswalk in time to avoid hitting them, they must slow down.

It is for that reason, as well as the fact that Bell was indisputably exceeding the posted speed limit when he hit and killed these three little girls, that we concur with the trial court's determination that the 45-mile per hour posted speed limit was not a proximate cause of the accident.

## DISPOSITION

The judgment is affirmed. The City is to recover its costs on appeal.

GOETHALS, J.

I CONCUR:

IKOLA, ACTING P. J.

13

**THOMPSON, J.,** dissenting. Triable issues of material fact exist regarding the dangerous condition alleged by plaintiffs. Therefore, I respectfully disagree with the majority's conclusion the trial court properly granted summary judgment to the City.

Among other things, plaintiffs contend the crosswalk was in a dangerous condition because of the relative contrast between (a) the light area illuminated by the streetlight at the south end of the crosswalk, and (b) the dark area under the large tree overhanging the north end of the crosswalk. They supported this contention with specific and uncontroverted evidence which the court ruled was admissible.

Multiple eyewitnesses testified the area was poorly lit and the north end of the crosswalk closest to the tree was darkest—in the words of one witness, "pitch-black." Even more compelling evidence came from plaintiffs' experts: Dale R. Dunlap, a registered civil engineer with decades of experience in traffic engineering and transportation design; and Jason A. Droll, a human factors scientist who evaluates human perception, response, memory and decision making.

Dunlap assessed the intersection and crosswalk where the accident occurred, and the roadway approaches to them. His declaration confirmed the streetlight closest to the crosswalk was at the southeast corner of the intersection, adjacent to the crosswalk's south end. It was the only streetlight close to the crosswalk, and the next closest was approximately 230 feet away.

Based on lighting measurements Dunlap took in and around the crosswalk at the same time of year and around the same time of night as the accident, he stated the brightest location in the area was immediately beneath the streetlight at the south end of the crosswalk. In contrast, lighting levels were much dimmer under the tree overhanging the north end of the crosswalk where the accident occurred. He explained "it [was] clear from the data that the tree had the effect of reducing the lighting levels . . . at the north end of the crosswalk."

1

Dunlap explained the significance of the large discrepancy in illumination between the crosswalk's south and north ends. Citing an American Association of State Highway and Transportation Officials (AASHTO) publication concerning the planning, design, and operation of pedestrian facilities, he stated "[l]ighting should be adequately spaced to provide a uniform level of light." Because the crosswalk streetlight failed to do so, the girls had walked from a lighted area into darkness. Plus, the low levels of light at the north end fell far short of roadway lighting standards established by AASHTO—by 28 percent at ground level, and by 72 percent at waist height level.

Dunlap ultimately opined "[l]ighting at the intersection . . . was deficient[,] leaving the intersection and crosswalk dangerous for nighttime users crossing [the street] with due care."

Droll provided an "[a]voidance [a]nalysis" of the intersection, crosswalk and roadway approaches, "address[ing] the necessary elements to ensure a driver can detect a pedestrian at night and safely stop before collision." Regarding illumination, he explained "[t]he only relevant available [artificial] illumination for pedestrians in the area [on the night of the accident] would [have been] from headlights or streetlights." Because headlight illumination has inherent limitations, he stated it is "often not sufficient for pedestrian detection," making streetlights necessary.

Like Dunlap, Droll took nighttime light measurements at various points within the crosswalk. Using a technique that captures illumination upon the exposed surfaces of pedestrians which face oncoming drivers, he found the illumination in the northern portion of the crosswalk was "significantly less" than in the southern portion. In addition, he observed "[a] large tree immediately north of the crosswalk further shades the northern portion of the crosswalk from any *ambient* illumination." (Italics added.)

Droll stated: "From my professional experience assessing areas with respect to their fostering of pedestrian detection, I could subjectively appreciate a driver's difficulty in detecting pedestrians, especially in the northern portion of the crosswalk."

2

And Droll opined "pedestrians within the incident crosswalk are not sufficiently illuminated to ensure their detection by drivers[.]"

Rather than responding to plaintiffs' illumination evidence with contrary evidence of its own, the City simply made objections to the Dunlap and Droll declarations. But the trial court overruled all of these objections, leaving plaintiffs' evidence and expert opinions uncontroverted.

The majority dismisses plaintiffs' uncontroverted evidence and rejects plaintiffs' contentions based upon its own fact-finding and weighing of the evidence. It finds: "[W]e cannot see how the tree at issue could have cast a material shadow . . . . On a dark night, the street light could only have caused the tree to cats its shadow away from the street . . . . That light would not have created a shadow over the area of impact of this accident." And it weighs the value of Dunlap's opinion, identifying matters it believes Dunlap should have, but failed to, discuss, and incorrectly claiming Dunlap failed to relate his opinion to conditions on the night of the accident.

This kind of judicial fact-finding and weighing of the evidence is not permitted in the summary judgment context. "It is clearly established that '[f]indings of fact and conclusions of law are required after "the *trial* of a question of fact by the court." [Citation.] They have no place in summary judgment procedure which seeks to discover whether there is anything to try and is concerned with "issue finding" not "issue determination." [Citations.] A summary judgment proceeding is not a trial on the merits. [Citation.]' [Citations.]" (*EHP Glendale, LLC v. County of Los Angeles* (2011) 193 Cal.App.4th 262, 275; see also *Binder v. Aetna Life Ins. Co.* (1999) 75 Cal.App.4th 832, 839 ["If the evidence is in conflict, the factual issues must be resolved by trial"].)

"There is to be no weighing of evidence." (*Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 880; see also *McIntosh v. Mills* (2004) 121 Cal.App.4th 333, 338.) Similarly, there is to be no resolving of fact issues. (*Calemine v. Samuelson* (2009) 171 Cal.App.4th 153, 161; see also *Sanchez v. Swinerton & Walberg Co.* (1996) 47

3

Cal.App.4th 1461, 1465-1466 ["The court has no power in a summary proceeding to weigh one inference against another or against other evidence"].)

The majority also relies on faulty logic to reject plaintiffs' disparate illumination contention. It concedes the evidence shows the north end of the crosswalk was darkest, but then asserts "[i]t does not support an inference that the tree exacerbated the darkness factor at the point of impact." Instead, the majority solely attributes the darkness to the location of the streetlight at the crosswalk's south end, and concludes it "cannot find that the presence of the tree . . . raises a question of fact related to the existence of a 'peculiar condition' that might necessitate lighting . . . ."

This analysis ignores Dunlap's and Droll's uncontroverted expert opinions concerning the effect of the tree, and it mistakes the inferences which may reasonably be drawn from the other evidence. The darkest location was under the tree. While the location of the streetlight may have contributed to the illumination disparity, it is also possible the tree played a role by blocking other point-source artificial and/or ambient light. And we are required to liberally construe this evidence and resolve all doubts in plaintiffs' favor. (*Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 717.)

Plus, evidence that the north end of the crosswalk was pitch black and the south end was better lit squarely aligns with plaintiffs' core contention—the crosswalk was dangerous because of the stark contrast in illumination between its two ends. Put another way, the artificial lighting provided by the single streetlight at the south end could have made the crosswalk more dangerous than it would have been had there been no streetlight at all or had there not been a tree blocking illumination from other point-source artificial and ambient light at the north end.

The majority separately concludes as a matter of law, based on *Antenor* and *Mixon*, "[a] public entity . . . cannot be held liable for failing to provide a consistent level of lighting." I question whether *Antenor* was correctly decided. The general rule it announced, that a municipality has no duty to light its streets, is dubious. The *Antenor*

4

opinion relies solely on an American Jurisprudence Second citation.[1]  Moreover, neither *Antenor* nor any subsequent case citing it has ever considered whether the general rule is consistent with California law.  (Cf. *Rowland v. Christian* (1968) 69 Cal.2d 108.)

Even if *Antenor* correctly stated the general rule, it recognized an exception may arise when there is "'some peculiar condition rendering lighting necessary in order to make the streets safe for travel.'"  (*Antenor, supra*, 174 Cal.App.3d at p. 483.)  The application of that exception is the crux of this case, as it was in *Mixon*.

I agree this case is virtually indistinguishable from *Mixon*.  But I would not follow *Mixon* here because it mistakenly construed the peculiar condition exception and it is not binding on us.  (*People v. Dimacali* (2019) 32 Cal.App.5th 822, 838.)

The accident in *Mixon* occurred in a marked crosswalk at a four-way intersection.  There was no streetlight above the intersection and it was undisputed nearby areas were more brightly lit.  (*Mixon, supra*, 207 Cal.App.4th at p. 132.)  The plaintiffs argued the lack of lighting at the intersection "made [it] especially dangerous because the poorly lit intersection contrasted sharply with better lit areas surrounding it."  (*Ibid*.)

The court rejected this argument as "no more than a variant of the long-rejected claim that a public entity is negligent for failing to provide streetlights."  (*Mixon, supra*, 207 Cal.App.4th at p. 134.)  It also rejected the plaintiffs' claim they were faulting "'the lighting configuration'" and the "'lighting scheme,'" not the lack of lighting.  (*Ibid*.)

---

[1]  The text of the relevant American Jurisprudence Second section has changed significantly and is now more equivocal than when *Antenor* was decided: "There is authority to the effect that, in the absence of a statutory or charter provision to the contrary, a municipality is generally under no duty to light its streets, even though it is given the power to do so; thus, its failure to light them is not actionable negligence, and will not render it liable in damages to a traveler who is injured solely by reason thereof. Under some authority, a duty to light a street, and the consequent liability for the failure to do so, may arise only if there is some peculiar condition rendering lighting necessary in order to make the streets safe for travel.  However, a governmental entity may be found negligent in its lighting of a road, under certain circumstances." (40 Am.Jur.2d (2019) Highways, Streets, and Bridges, § 342, fns. omitted.)

The court stated "it all amounts to the same thing" and posited "[t]he only cure for [the alleged] defect is more lighting at the intersection[.]" (*Ibid.*)

I do not agree. Plaintiffs' argument in this case, like the one in *Mixon*, is more than just a variant of the claim that a public entity is negligent for failing to provide streetlights. They do not argue the crosswalk was dangerous simply because it was not well lit. Rather, they fault the lighting configuration. Again, the alleged dangerous condition here is the contrast between the lighted area at the south end of the crosswalk and the dark area at the north end, which made it more difficult to perceive pedestrians in the crosswalk. A contrast in lighting is not necessarily the same as a lack of lighting.

Likewise, it is simply not true "[t]he only cure for such a defect is more lighting . . . ." (*Mixon, supra*, 207 Cal.App.4th at p. 134.) There are cures for a contrast in lighting which do not require more lighting. Depending on the precise problem in a given case, alternatives could include, for example, reducing or eliminating artificial lighting, trimming or modifying adjacent landscaping, and/or providing additional devices to warn motorists of the presence of pedestrians.

Thus, contrary to *Mixon*, a public entity can be liable for failing to provide consistent lighting, even if it has no general obligation to provide lighting in the first instance. (Cf. *Teall v. City of Cudahy* (1963) 60 Cal.2d 431, 434 [though city does not have general duty to install traffic signals, "[i]t may be held liable if it created a dangerous or defective condition in doing so"]; accord *De La Rosa v. City of San Bernardino* (1971) 16 Cal.App.3d 739, 746.) And a public entity can be liable for failing to ensure the interplay of natural conditions (e.g., tree growth) and artificial conditions (e.g., lighting) does not, over time, render public property dangerous by creating a substantial risk of injury for those using the property with due care. (See § 830 [defining dangerous condition]; *Bonanno v. Central Contra Costa Transit Authority* (2003) 30 Cal.4th 139, 149, italics omitted [public property may be in a dangerous condition "'because of the design or location of the improvement, [or] the interrelationship of its

6

structural or natural features'"]; *Bakity v. County of Riverside* (1970) 12 Cal.App.3d 24, 30 [condition of property adjacent to public property may render public property dangerous if it exposes users to substantial risk of harm].)

By following *Mixon* here, the majority incorrectly rejects the application of the peculiar condition exception announced in *Antenor*. That the majority does so under the guise of public policy, stating the Legislature should be the one to determine whether cities may be liable for street light-related conditions, is particularly troublesome. The Legislature acted more than 50 years ago when it established a public entity may be held liable for injury caused by a dangerous condition of its property, and it specified what constitutes a dangerous condition. (§§ 830, subd. (a), 835.) Since then, courts and juries have been charged with determining, on a case-by-case basis, whether such a condition existed and, if so, whether it led to injury.

Finally, the City offered additional arguments why we should affirm the summary judgment, including lack of notice to the City of the alleged dangerous condition, lack of causation, existence of a trivial defect, statutory immunities (§§ 830.4, 830.8), and design immunity (§ 830.6). None of these arguments save the summary judgment. The claimed immunities do not apply and there are triable issues of material fact on the remaining matters as well.

For all these reasons, the summary judgment should be reversed, and this case should be allowed to proceed to trial on the merits as preferred by California law.


THOMPSON, J.


7