Filed 2/7/25  Chuluunbat v. Suoja CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| ALTANTSETSEG CHULUUNBAT, <br><br>    Plaintiff and Appellant, <br><br>v. <br><br>VICTORIA SUOJA et al., <br><br>    Defendants and Appellants. | A167310 <br><br>(Contra Costa County <br>Super. Ct. No. CIVMSC20-00716) |

Victoria Suoja (Suoja)[1] was driving on Bancroft Road in Walnut Creek when she failed to stop at a red light and struck and injured Togtokh Oyuntseren as he rode his bicycle through the crosswalk.  Oyuntseren's mother and conservator, Altantsetseg Chuluunbat, filed a lawsuit on her son's behalf against Suoja and her husband for negligence, and against the City of Walnut Creek (City) for creating and maintaining a dangerous condition of public property.  The trial court granted the City's motion for summary judgment on the operative complaint and the Suojas' cross-complaint against the City after concluding there was no triable issue of material fact that a dangerous condition existed at the accident site.

---

[1] Suoja and her husband were erroneously sued by the last name "Souja."  We use the correct spelling in our opinion.

1

We conclude summary judgment was erroneously granted because Chuluunbat and the Suojas (hereafter appellants) raised a triable issue of material fact that the close proximity of traffic control signals in the area of the subject accident, combined with the City's failure to synchronize those signals and/or utilize visibility-limited signal heads, increased or intensified the risk that a motorist would become confused as to the controlling signal and run a red light. The evidence also raised a triable issue that unmaintained vegetation near the crosswalk obstructed a motorist's view of persons in the crosswalk, further contributing to the dangerous condition of public property. Finally, we conclude the City was not entitled to summary adjudication on its affirmative defenses of design and trail immunity. Accordingly, we reverse the judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

**A. The Crossing**

The Contra Costa Canal Regional Trail (the Trail) is a paved trail in Contra Costa County operated by the East Bay Regional Park District for use by pedestrians, runners, bicyclists, hikers, and equestrians. The Trail intersects with Bancroft Road in Walnut Creek at a mid-block crossing approximately one-half mile north of Ygnacio Valley Road (the Crossing). At the Crossing, Bancroft Road generally runs in a north-south orientation and has two lanes of travel in each direction. The speed limit here is 40 miles per hour.

Approximately 320 feet north of the Crossing is an intersection at Pomar Way (Pomar intersection), which is controlled by a traffic signal, and feeds into the Countrywood Shopping Center to the east. About 580 feet north of the Pomar intersection is another intersection at Treat Boulevard (Treat intersection), which is also controlled by a traffic signal. Thus, within

2

the distance of roughly 1,000 feet, there are three traffic signals on Bancroft Road, each controlling a different intersection or crossing.

The Crossing's traffic signals, crosswalk, and other markings were installed according to plans designed and approved by City engineers in or around 1992. Pursuant to those plans, the City: (1) constructed a median between the northbound and southbound lanes of Bancroft Road and installed vegetation in the median; (2) installed three traffic signal heads for northbound traffic at the Crossing, including one signal above each northbound lane, and a third signal to the right of the number two (right) lane; and (3) placed a white crosswalk across all lanes of Bancroft Road at the Crossing, a white-striped limit line 30 feet before the marked crosswalk, and two signs stating "STOP here on RED" on each side of the limit line.

Further improvements to Bancroft Road were made in 2001 and 2002, including restriping the crosswalk at the Crossing, resurfacing the road from the Crossing to Treat Boulevard, and rebuilding the existing median between Pomar Way and Treat Boulevard.

**B. 2014 Modifications to the Pomar Intersection**

In 2014, the traffic signal at the Pomar intersection was modified pursuant to a City contract. The plans, approved by City Engineer Steven Waymire, called for (1) replacing the existing 30-foot traffic signal arm above the northbound lanes of Bancroft Road at Pomar Way with a longer, 50-foot arm; and (2) installing four traffic signal heads across the northbound lanes of Bancroft Road, including one above each of the two northbound lanes, a third above the left turn lane, and a fourth to the right of all the lanes.

A record produced by the City in discovery entitled "Traffic Signal Modification at the Intersection of Pomar Way and Bancroft Road" (hereafter the 2014 project document) explained these modifications. (Boldface

omitted.)  There were concerns that "northbound drivers do not see the signal indications in advance and some drivers do not have adequate perception reaction time.  [The] City's records show [a] high number of right-of-way accidents at this intersection.  The existing signal arm only covers the furthest right lane.  Installing a signal standard with a longer arm to cover all traffic lanes and provide for additional signal indications for the approach will improve safety at the intersection."  The 2014 project document further noted that "[c]urrently, the green indications at Treat Boulevard are visible for traffic on northbound Bancroft Road far in advance before arriving at Pomar Way.  These indications over shadow the red indications at Pomar Way.  Some motorists see the green lights at Treat Boulevard before they see the red light at Pomar Way.  Therefore, they drive through the red light thinking they have green indications."

During his deposition in this case, City Engineer Rafat Raie acknowledged that before the 2014 modifications were made, the Pomar intersection was an "engineering issue for years as the northbound light only went partially into the very wide intersection and people would simply see the light and be looking at the light at Treat instead."  Raie testified that he was aware of " 'several broadside crashes here over the years,' " and that the City "moved the mast arm to the west to improve the visibility for the northbound driver at this traffic signal so that it will be more clear that there is a traffic signal at Pomar."  Raie agreed that northbound motorists were focusing on the signal light at Treat Boulevard instead of the light at Pomar Way.

In addition to extending the Pomar signal arm, the 2014 project document recommended that the traffic signals at the Treat intersection "facing northbound through traffic . . . be converted to program visibility" in

4

order to "further enhance the safety at the intersection of Pomar Way and Bancroft Road. . . . Having program visibility signal indications at Treat Boulevard will not make the indications visible until drivers depart from the intersection of Bancroft with Pomar Way." As Raie explained, with a visibility-limited signal, the light indication cannot be seen until a motorist is within a certain distance to the signal. It is unclear whether such visibility-limited signal faces were, in fact, installed at the Treat intersection as recommended. However, it was undisputed that visibility-limited signals were implemented at 32 other intersections in the City, including at the Crossing in the *southbound* direction.

### C. 2014 Citizen Complaint and the City's Response

Prior to the 2014 modifications at Pomar Way, the City received no complaints about red light violations at the Crossing. That began to change shortly after the 2014 modifications were complete.

In September 2014, citizen Carmen McVey emailed the City, reporting that she and her family members had witnessed motorists running red lights at the Crossing and "near misses of four human lives," including a pregnant family member and a mother pushing a child in a stroller. McVey asked the City to solve this "dangerous condition . . . before it's too late" and noted that "[o]ther areas in our city have flashing lights at crosswalks," which could be "a start."[2]

---

[2] The parties disagree as to whether the hearsay exception for spontaneous statements (Evid. Code, § 1240) permits the admission of complaints by McVey and other citizens for the truth of the matters asserted (e.g., that vehicles ran red lights at the Crossing). (See section B.1. of the Discussion, *post*.) However, because there is no dispute as to the existence of these complaints, we describe them here for purposes of background.

In response to McVey's complaint, the City contracted with a private contractor (ATD) to record video of traffic at the Crossing. ATD performed the recording on Saturday, September 20, 2014, from 11:00 a.m. to 1:45 p.m. At his deposition, Raie testified that the video showed "there were 12 vehicles that went through the red light," and that this was a "major concern" for the City.

In response to McVey's complaint and the ATD video, the City installed two "Signal Ahead" warnings signs approximately 500 feet and 180 feet south of the Crossing, respectively. A proposed "long term response" was to install a signal head in the median between the northbound and southbound lanes of Bancroft Road "to increase visibility for this location," but this proposal was not implemented. A proposed "short term response" was to "[t]rim [the] landscaping to increase visibility of [the] signal heads." It was undisputed that the City had no record of any maintenance of the vegetation in the median prior to the subject accident.

### D. 2016 Accident at the Crossing

In April 2016, a motorist driving northbound in the number one (left) lane on Bancroft Road ran a red light at the Crossing and struck a bicyclist who was traveling eastbound through the crosswalk. The driver reported that he did not see the red light at the Crossing and was "focused on the next signal ahead" at the Pomar intersection.

### E. Three Citizen Complaints in 2018

In May 2018, the City received an email from a citizen named "Sheila" reporting "a pedestrian hazard" at "the stoplight at the canal trail" on Bancroft Road. Sheila wrote that there were "[c]yclists, joggers, parents with strollers, etc[.] us[i]ng the crosswalk every day," and that she had "witnessed too many near misses of people getting hit, as drivers speed through the red

6

spotlight." She further explained she "noticed a Tree or large bush is overgrown coming into the street blocking one of the stoplights from a distance," and she opined that "[p]eople may get confused with all the stoplights at the next location across from Pomar way@ Countrywood."

A few days later, citizen Steven Connolly emailed the City with the subject line, "Very dangerous obscured red light on Contra Costa Canal Trail at Bancroft." Connolly reported, "Unlike all the other intersections at Treat and Ignacio, we have seen nearly a <u>dozen times</u> that people speed through the red light and potentially kill a pedestrian crossing Bancroft Road." He continued, "I am furious because, just today, **I was almost killed TWICE in one crossing! Two cars went through the same red light maybe 20 seconds after it had turned red and they both missed hitting me by seconds**." Connolly opined that the dominant problem was "**poor visibility of the red light** over the Trail," which "is especially limited in the North Bound direction, perhaps due to a very large tree that is blocking the visibility of the red lights a few hundred yards to the south (near Bancroft and Amberwood Lane)." He also noted that "<u>very dangerous</u>" plants in the median needed to be trimmed because "nobody can see a biker or baby carriage through these plants." Connolly made various recommendations to the City to address his concerns.

In June 2018, citizen Kirsten Johnsen emailed the City to report that she had witnessed many cars run the light at the Crossing, and that she, her daughter, and a bicyclist were "almost hit recently." Johnsen further wrote that "[s]omeone is going to die there unless it's addressed." Johnsen made various recommendations including "additional light warning signals and possibly a camera at the Bancroft crosswalk bike trail by Countrywood."

The City responded to each complainant by stating that it was conducting a study to "promote visibility" at the Crossing.

**F. Kimley-Horn**

In September 2018, the City retained consulting firm Kimley-Horn to review traffic signal visibility at three locations including the Crossing. Raie instructed Kimley-Horn to coordinate its efforts with Traffic Engineer Smadar Boardman. Despite an initial meeting, Boardman did not follow up on data requests from Kimley-Horn and admitted during her deposition that she had no further contact with the firm regarding a field visit they conducted, observations they made, or data they had requested.

**G. The Accident**

In August 2019, at around 11:30 a.m., Oyuntseren was riding his bicycle eastbound on the Trail. He entered the Crossing while the pedestrian signal was green, first crossing the southbound lanes of Bancroft Road before reaching the median.

Meanwhile, Suoja was driving northbound in the number one (left) lane of Bancroft Road at around 20 miles per hour. The sky was clear, and the road surface was dry. Suoja was wearing her seat belt and prescription eyeglasses, was not under the influence of alcohol or drugs, and was not eating, drinking, or using her phone. She was not distracted or in a hurry, but she was unfamiliar with the area.

As Suoja neared the Crossing, the traffic signal was red, and there were two vehicles in the number two (right) lane of Bancroft Road that had already stopped behind the white limit line in front of the Crossing. Suoja testified that she saw a green signal light at the Pomar intersection and mistakenly believed it was the controlling signal for the Crossing. She further testified that she did not see the two diamond-shaped yellow signs to

8

her right warning of the traffic signal ahead at the Crossing, or the two vehicles stopped in the number two lane.  Believing she had a green light, Suoja drove through the Crossing and struck Oyuntseren as he emerged from the median on his bicycle.  Suoja testified that "all of a sudden, . . . out of the blue, . . . a bike came out, and we collided, and he was on my windshield."  Witness Barbara Lawton testified that after the collision, Suoja repeatedly said, " 'It was green' " while pointing towards the light at Pomar Way.

As a result of the collision, Oyuntseren suffered a head injury with permanent brain damage.

## H. Procedural History

### 1. *Pleadings*

In March 2021, Chuluunbat filed the operative first amended complaint against the Suojas and the City.  In the first cause of action, Chuluunbat alleged that Suoja negligently operated the vehicle that struck Oyuntseren; that Suoja's husband, William Suoja, negligently entrusted the vehicle to his wife; and that the Suojas negligently serviced, repaired, maintained, and controlled the vehicle.  In the second cause of action against the City, Chuluunbat alleged that Oyuntseren was injured because of dangerous conditions created by the City, including the failure to properly construct, design, and maintain the Crossing.  In the third cause of action, Chuluunbat alleged that the City negligently constructed, developed, and designed both the Crossing and the intersection at Pomar Way, as "the timing, location, and management of the traffic control signals" in the area "create a dangerous condition by creating confusion and misdirection of the control of the intersection."  Chuluunbat further alleged there were "numerous accidents" at the Crossing "involving confusion and misperception of the signal lights at the adjacent" Pomar intersection, as well as "multiple complaints regarding

9

the safety of" the Crossing due to "confusion and misperception of the signal lights."

The Suojas filed a cross-complaint against the City for indemnity, contribution, apportionment, and declaratory relief, alleging that any liability they had to Chuluunbat arose by reason of the dangerous condition of public property.

### 2. *The City's Motion for Summary Judgment*

The City filed a single motion for summary judgment, or alternatively summary adjudication, as to Chuluunbat's first amended complaint and the Suojas' cross-complaint, arguing: (1) no dangerous condition existed at the Crossing at the time of the accident; (2) the City has design immunity; (3) the City has trail immunity; and (4) the absence of liability to Oyuntseren foreclosed any liability to the Suojas on their cross-complaint.

Both Chulunnbat and the Suojas opposed the motion, arguing there was a triable issue of material fact as to whether the Crossing constituted a dangerous condition of public property, and challenging the City's claims of design and trail immunity.

### 3. *Decision and Judgment*

After issuing a tentative ruling and holding a hearing, the trial court issued its written order denying the City's motion for summary adjudication as to its affirmative defenses of design and trail immunity, but granting the City's motion for summary judgment on Chuluunbat's first amended complaint based on its finding that Chuluunbat failed to meet her burden of establishing that a dangerous condition existed at the Crossing.

As to portion of the City's motion against the Suojas on their cross-complaint, the trial court criticized the City's combination of two separate motions for summary judgment into a single one. ~(8JA1954)~ But in light of

10

its summary judgment ruling that Chuluunbat had demonstrated "no basis for liability" against the City for the underlying accident, the court held that Suoja's cross-complaint for indemnity, contribution, and apportionment failed as a matter of law.  Accordingly, the court granted the City's motion for summary judgment as to the cross-complaint as well.

With regard to the parties' evidentiary objections, the trial court issued rulings only as to those objections the court found to be "material to the disposition of" the motion for summary judgment/adjudication.  The court issued rulings on Chuluunbat's objections to the City's evidence and the City's objections to Chuluunbat's evidence, but made no rulings on the Suojas' or the City's objections to each other's evidence.

The trial court then entered a single judgment in favor of the City on Chulunnbat's first amended complaint and on the Suojas' cross-complaint. Appellants each filed a timely notice of appeal.

## DISCUSSION

### A. Standard of Review

Summary judgment is properly granted when there is no triable issue of material fact and the moving party is entitled to judgment as a matter of law.  (Code Civ. Proc., § 437c, subd. (c).)  "A party may move for summary adjudication as to one or more causes of action within an action" or "one or more affirmative defenses" by demonstrating that "a cause of action has no merit," either because "[o]ne or more elements of the cause of action cannot be separately established," or the defendant "establishes an affirmative defense to that cause of action."  (*Id.*, subds. (f), (o).)  If the defendant meets its burden, the burden shifts to the plaintiff to show the existence of a triable issue of material fact.  (*Id.*, subd. (p)(2).)

11

On appeal, we review a grant of summary judgment de novo, accepting as true the facts in the evidence of the party opposing summary judgment and the reasonable inferences that can be drawn from them, viewing the evidence in the light most favorable to the opposing party, and liberally construing that party's evidentiary submissions, while strictly scrutinizing the moving party's evidence. (*Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 253–254.) Summary judgment is " 'a drastic remedy to be used sparingly,' " and " 'any doubts about the propriety of summary judgment must be resolved in favor of the opposing party.' " (*Richards v. Sequoia Ins. Co.* (2011) 195 Cal.App.4th 431, 435.) The court may not weigh the plaintiff's evidence or inferences against the defendant's as though it were sitting as the trier of fact. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 856.)

In deciding whether a material factual issue exists, we consider " ' "all of the evidence set forth in the papers, except the evidence to which objections have been made and sustained by the court, and all inferences reasonably deducible from the evidence." ' " (*Butte Fire Cases* (2018) 24 Cal.App.5th 1150, 1157–1158; Code Civ. Proc., § 437c, subd. (c).)

**B. Evidentiary Objections**

We begin by addressing the parties' arguments regarding the trial court's rulings (or lack thereof) on the evidentiary objections. The weight of authority holds that appellate courts review a trial court's rulings on evidentiary objections in summary judgment proceedings for abuse of discretion. (*Schmidt v. Citibank, N.A.* (2018) 28 Cal.App.5th 1109, 1118; see *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 535 (*Reid*).) A ruling constitutes an abuse of discretion if it is " ' "so irrational or arbitrary that no reasonable person could agree with it" ' " or it falls outside " 'the confines of the

12

applicable legal principles.' " (*Krolikowski v. San Diego City Employees' Retirement System* (2018) 24 Cal.App.5th 537, 570.)

"[I]n the summary judgment setting, . . . a trial court presented with timely evidentiary objections in proper form must expressly rule on the individual objections." (*Demps v. San Francisco Hous. Authority* (2007) 149 Cal.App.4th 564, 578.)  If the trial court fails or elects not to rule on objections, the objections are preserved for de novo appellate review.  (Code Civ. Proc., § 437c, subd. (q); *Reid, supra,* 50 Cal.4th at pp. 531–532.)

### 1. Citizen Complaints

Chuluunbat submitted copies of the citizen complaints made to the City in 2014 and 2018 regarding red light violations at the Crossing.  The City objected to the evidence as inadmissible hearsay.  In its written order, the trial court remarked that "the four complaints sent to [the City] in the five years preceding the accident are inadmissible hearsay," but that even if they were admissible, they would be relevant only to the issue of whether the City had notice of a potentially dangerous intersection, not to prove the existence of a dangerous condition.  Later, in ruling on the evidentiary objections, the court "[o]verruled" the City's objections to the citizen complaints.

The City argues that the trial court's latter "inconsistent ruling was an inadvertent error" and that the "initial ruling was correct."  We infer that the court found the citizen complaints to be admissible to provide background facts and to show that the City knew of the complaints, but inadmissible to prove the truth the matters of asserted (e.g., vehicles were running red lights at the Crossing).  On this latter point, Chuluunbat argues the citizen complaints fell within the hearsay exception for spontaneous statements. (Evid. Code, § 1240.)  We disagree.

13

Evidence of a statement that "[p]urports to narrate, describe, or explain an act, condition, or event perceived by the declarant" is admissible if the statement "[w]as made spontaneously while the declarant was under the stress of excitement caused by such perception." (Evid. Code, § 1240.) For the exception to apply, " '(1) there must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been [made] before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it.' " (*People v. Poggi* (1988) 45 Cal.3d 306, 318.) " 'A spontaneous statement is one made without deliberation or reflection.' [Citation.] The ' "crucial element" in determining whether a statement is sufficiently reliable to be admissible as a spontaneous statement is ' "the mental state of the speaker. The nature of the utterance—how long it was made after the startling incident and whether the speaker blurted it out, for example—may be important, but solely as an indicator of the mental state of the declarant." ' " (*People v. Lozano* (2024) 101 Cal.App.5th 366, 376.)

The trial court impliedly ruled that the hearsay exception for spontaneous statements did not apply, and we conclude this was not an abuse of discretion. While it may be inferred that the citizens were startled and excited by what they claimed to have witnessed (red light violations and "near misses" of pedestrians in the crosswalk), the court could reasonably conclude the complaints also reflected the citizens' deliberative and reflective mental states. From the emails, it was apparent that the citizens had sought out the appropriate contacts with the City, described in detail what they had seen, commented on possible causes, and offered recommendations on how

14

the City could remedy the problem.  On this record, the court could reasonably conclude the citizens' reflective powers were no longer held in abeyance by the emotional impact of what they had seen, and accordingly, the complaints were not admissible under Evidence Code section 1240 for the truth of the matters asserted.  (See, e.g., *People v. Ramirez* (2006) 143 Cal.App.4th 1512, 1524–1525 [error to admit statements by rape victim hours after crime after she had deliberated and reflected on what had occurred]; *People v. Pirwani* (2004) 119 Cal.App.4th 770, 789–790 [statement when victim was distraught and tearful but after she had gone to police and told them everything was improperly admitted].)

### 2.  *Statewide Integrated Traffic Records System (SWITRS)*

In support of summary judgment, the City submitted a copy of the SWITRS collision history for the area of the subject accident as exhibit LL to its index of exhibits.  Chuluunbat argues the trial court erred by relying on the SWITRS data because it "had ruled that evidence inadmissible."  We reject this contention.

The SWITRS report was authenticated and cited by the City's engineering expert, Christian Engelman, in support of his opinion that there was no pattern of accidents substantially similar to the subject collision at the Crossing.  Although Chuluunbat objected to Engelman's conclusions, she did not object to exhibit LL or the portion of Engelman's declaration authenticating it, and none of the court's evidentiary rulings pertained to exhibit LL.  Thus, Chuluunbat fails to demonstrate error on this matter.

### 3.  *Total Number of Motor Vehicles on ATD Video*

Chuluunbat contends the trial court erred by relying on Engelman's assertion that 1,766 motor vehicles passed through the Crossing during the video taken in September 2014 for the City's study of traffic flow at the

Crossing. As Chuluunbat explains, she prevailed on her objection to this portion of Engelman's declaration, yet the court later remarked (incorrectly) that Chuluunbat did not dispute the number of cars that passed through the Crossing during the video. We agree.

Preliminarily, we note the ATD video was not itself admitted into evidence. In his declaration, Engelman did not explicitly state that he had viewed the ATD video, but rather, that he based his conclusions on an " '[a]nalysis of the video taken in 2014 of 1,766 vehicles traveling through the subject location,' " with no specific reference to who performed this analysis. As far as we are aware, no admissible evidence in the record provided a count of how many motor vehicles passed through the Crossing during the ATD recording.

In her objection no. 5 to Engelman's declaration, Chuluunbat maintained that to the extent Engelman relied on an unspecified person's analysis of the video, this was inadmissible hearsay. The trial court apparently agreed and sustained Chuluunbat's objection no. 5 on hearsay and other grounds. The City does not argue that the court erred in so ruling.

Yet, when the trial court later recited Engelman's 1,766 figure, it remarked that Chuluunbat "disagrees with the conclusions to be drawn from the study" but "does not dispute the number of vehicles passing through the Canal Trail Crossing." In so concluding, the court cited Chuluunbat's response to undisputed material fact (UMF) 58 but overlooked her response to UMF 57, which expressly set forth Engelman's 1,766 figure and Chuluunbat's hearsay objection thereto. Thus, Chuluunbat did dispute Engelman's assertion that 1,766 motor vehicles passed through the Crossing during the September 2014 red light study by objecting (successfully) to the assertion on hearsay grounds.

16

Accordingly, we conclude the trial court erred in relying on Engelman's statement that 1,766 motor vehicles passed through the Crossing during the September 2014 ATD recording, as the court overlooked its own ruling sustaining Chuluunbat's hearsay objection to this evidence.

### 4. *Engelman Declaration*

Chuluunbat presents numerous arguments challenging the trial court's rulings on her objections to the declaration of the City's engineering expert, Engelman. We have examined these arguments and, for the sake of brevity and efficiency, conclude most do not demonstrate an abuse of discretion or prejudicial error. (See *Christ v. Schwartz* (2016) 2 Cal.App.5th 440, 455.) However, we conclude Chuluunbat has demonstrated the court prejudicially erred as to one of her main objections to the Engelman declaration, which we will now address.

Engelman concluded that notwithstanding the April 2016 vehicle-to-bicyclist accident at the Crossing, "one substantially [similar] accident over the course of five years is inconsequential, when millions of vehicles have traversed the location." To support his estimate, Engelman explained that that as a traffic engineer, he routinely relies on traffic count data "to approximate the volume of traffic passing through a particular stretch of highway over a given time," and that based on "available volume counts from the City's speed survey records and [Annual Average Daily Traffic] data for Bancroft Road and interpolating volume data values for years where there is no available data, a total of approximately 20.8 million vehicles passed through the Crossing on northbound Bancroft Road in the five years prior to the subject accident." Engelman also cited exhibit T to the City's index of exhibits.

17

Exhibit T was authenticated by City Engineer Waymire, who explained in his declaration that in October 2014, the City contracted with W&S Solutions, LLC (W&S) to perform traffic counts, including turning movement data, on Bancroft Road at Pomar Way, and this study included counts of motor vehicles traveling northbound on Bancroft "in the vicinity of" Pomar Way. Waymire identified exhibit T as a true and correct copy of "the data collected through this study, maintained in the ordinary course of business by the City."

Chuluunbat did not object to the City's exhibit T, but she objected to Engelman's 20.8 million figure on the grounds of lack of personal knowledge, improper expert opinion, and hearsay. Appellants contend the trial court erred in overruling those objections because Engelman failed to explain how he arrived at the 20.8 million figure from the City's records and how the data was compiled. We agree.

"[T]he opinion of any expert 'is only as good as the facts and reasons on which it is based.' " (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 633.) Pursuant to Evidence Code sections 801 and 802, the trial court has a "gatekeeping responsibility with respect to expert testimony." (*Garrett v. Howmedica Osteonics Corp.* (2013) 214 Cal.App.4th 173, 186 (*Garrett*), citing *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 771.) "Evidence Code section 802 allows the trial court to inquire into the reasons for an expert's opinion so as to determine whether those reasons are supported by the material on which the expert relies," and the court " 'properly act[s] as a gatekeeper to exclude speculative expert testimony' " (*Garrett*, at pp. 188–189). Although in general, courts must be " 'cautious in excluding expert testimony' " (*id.* at p. 186), at summary judgment, the moving party's " ' "submissions are scrutinized strictly, while

the opponent's are viewed liberally." ' " (*Mackey v. City of Trustees of California State University* (2019) 31 Cal.App.5th 640, 657 (*Mackey*).) "In light of the rule of liberal construction, a reasoned explanation required in an expert declaration filed in opposition to a summary judgment motion need not be as detailed or extensive as that required in expert testimony presented in support of a summary judgment motion or at trial." (*Garrett*, at p. 189.)

In his declaration, Engelman included a table of figures apparently as a way to demonstrate how he arrived at his conclusion that 20.8 million motor vehicles traveled through the Crossing in the five years preceding the subject accident. Beyond this, however, Engelman did not actually explain how he calculated the 20.8 million figure from the values in the table and what considerations and assumptions about daily traffic volume went into his calculation, including how he "interpolat[ed] volume data values for years where there is no data available." By itself, the City's exhibit T—a set of spreadsheets of "Turning Movement Data" that appears to have been compiled by W&S over the course of one day in October 2014—did not elucidate Engelman's methodology for determining a cumulative number of motor vehicles over a five-year span.

Meanwhile, Chuluunbat's engineering expert, Dale Dunlap, criticized Engelman's methodology as "not consistent with the practice of civil engineering" and "meaningless in the field of engineering." According to Dunlap, "evaluat[ing] the frequency of accidents along a representative segment of a road, or at a specific location along the road such as at the trial crossing, requires more analysis than simply calculating the number of vehicles that pass through the area without incident and declaring that so many vehicles pass through this area safely." To underscore the point, Dunlap argued that by the same logic as Engelman's, the fact that the ATD

19

video showed at least two red light violations in less than three hours "results in 23,585 vehicles having run the red light in a five-year period," which therefore "results in the possibility of 23,585 pedestrians or bicyclists being struck in the subject crossing due to vehicles running the red light."

For reasons that are unclear, the trial court sustained the City's objections to the above portions of Dunlap's opinion as inadmissible hearsay, even though Dunlap was citing the same figures as Engelman not for their truth, but to offer a reasoned criticism of Engelman's methodology. In our view, the court's differential treatment of these experts' declarations was inconsistent with the principle that courts must strictly construe the moving party's evidence on summary judgment while liberally construing the opposing party's evidence. (*Garrett*, *supra*, 214 Cal.App.4th at p. 189.) Furthermore, even without Dunlap's criticisms, Engelman's declaration, strictly scrutinized, failed to provide a reasoned explanation that demonstrated his opinions were supported by the materials on which he claims to have relied. (*Id.* at p. 188.)

For these reasons, we conclude the trial court erroneously overruled Chuluunbat's objection to the portion of Engelman's declaration estimating that 20.8 million vehicles traveled through the Crossing in the five years preceding the subject accident.

### 5. *Declaration of Rajeev Kelkar*

The City's accident reconstruction expert, Rajeev Kelkar, Ph.D., asserted in his declaration at paragraph 5(f) that "[t]here is an unobstructed line of sight of a minimum of 650 feet to the traffic light at the trail crossing for a driver in the #1 northbound lane of Bancroft Road approaching the trial crossing." Dr. Kelkar further stated in paragraph 5(g): "In that distance of at least 650 feet, there are no visual obstructions for a driver in the #1

20

northbound lane of Bancroft Road to vehicles approaching or stopped at Canal Trail Crossing in the #2 northbound lane of Bancroft Road." Chuluunbat objected to these paragraphs on the grounds of lack of foundation and personal knowledge, hearsay, and relevance, and the trial court sustained the objections to paragraph 5(f) but made no ruling as to paragraph 5(g).

Chuluunbat now contends her objection should have been sustained to paragraph 5(g) as well because Dr. Kelkar offered no facts to show that conditions at the Crossing at the time he visited it were the same as they were at the time of the subject accident, or any facts to show how he concluded there were no visual obstructions within 650 feet of the Crossing while approaching northbound on Bancroft Road. The City insists that Dr. Kelkar's conclusions in paragraphs 5(f) and 5(g) were appropriately based on his site visits, deposition testimony, and police body camera footage and photographs taken at the accident scene. However, while Dr. Kelkar generally mentioned these items among the list of materials he reviewed in formulating his opinions, he did not specifically explain how he reached the 650-foot measurement or what specific materials or evidence supported it and how. Strictly scrutinized, Dr. Kelkar's declaration failed to provide a reasoned explanation that demonstrated his opinions were supported by the materials on which he relied. (*Garrett*, *supra*, 214 Cal.App.4th at p. 188.) Accordingly, Chuluunbat's objection to paragraph 5(f) was properly sustained, and her objection to paragraph 5(g) was valid as well.

### 6. *Dunlap Declaration and Photograph of the Median*

In paragraph 9 of his declaration, Chuluunbat's engineering expert, Dunlap, attached as exhibit D a photograph purportedly taken on the date of the subject accident depicting the condition of the vegetation in the median of

21

Bancroft Road. He then opined that the vegetation, while not completely blocking a northbound motorist's view of persons in the median, "does obscure the motorist[']s view more than what would be considered advisable," and that "[f]or increased safety at the [C]rossing, the vegetation in the median should be trimmed to a height which would not obscure an approaching motorist[']s view to clearly observe anything above 24-inches in height, which is the standard target height for site distance in the field of civil and traffic engineering related to roadway design and operations."

The trial court sustained the City's objection to paragraph 9 and exhibit D of Dunlap's declaration for lack of personal knowledge and foundation. Chuluunbat argues this was error because Dunlap provided an adequate foundation for his statements by basing it on the photograph taken of the scene on the day of the accident. We agree in part.

The trial court was technically correct to conclude that Dunlap failed to authenticate the exhibit D photograph, as his declaration lacked foundational facts to establish the photograph was that which Dunlap claimed it to be. However, we cannot turn a blind eye to the fact that a copy of apparently the same photograph was admitted over the City's objection as an exhibit to the declaration of Chuluunbat's counsel, Steven Anthony.

The City contends the trial court "erred and abused its discretion by overruling this Objection without explanation," but we are not persuaded. Anthony provided adequate foundational facts by stating in his declaration that the photograph was an exhibit from the deposition of City traffic engineer, Boardman, who confirmed in her testimony that the exhibit was an image of "the northbound approach of Bancroft at the Canal crossing." The photograph itself depicts yellow police tape cordoning off the Crossing and two vehicles (including a police vehicle) parked in a configuration similar to

that which is seen in the City's own photograph taken on the day of the accident. On this record, the trial court did not abuse its discretion in concluding the photograph was sufficiently authenticated by Anthony.

The City nonetheless maintains Dunlap could not rely on the photograph because it does not represent what Suoja would have seen from her driver's seat as she approached the Crossing. For this, the City relies on Dr. Kelkar's supplemental declaration in which he states that he used a "photogrammetry" software program to determine that the photograph Dunlap viewed was taken at a height "significantly lower" than the approximate height of a driver in Suoja's car. But this argument, which is based on the conflicting views of experts as to whether the photograph depicts a dangerous condition, goes to the weight of the evidence, not its admissibility. (See *People v. Bui* (2001) 86 Cal.App.4th 1187, 1196.)

As to the remainder of paragraph 9 of Dunlap's declaration, we conclude the trial court erred in sustaining the City's objections for lack of foundation and personal knowledge. We may reasonably infer that Dunlap's opinions about the height of the vegetation in the median were based on his review of the photograph in exhibit D to his declaration. And while that exhibit was properly excluded, we see no principled reason why Dunlap should have been prevented from rendering his opinions given that another copy of the same photograph was admitted elsewhere in Chuluunbat's papers. We further conclude Dunlap laid an adequate foundation for his opinions on the standard target height for site distance by setting forth his qualifications as an expert in civil and traffic engineering. These were matters squarely within Dunlap's field of expertise and should not have been excluded.

23

### 7. *The Suojas' Evidence*

Because the trial court did not rule on any of the City's objections to the Suojas' evidence, we independently review those objections based on the arguments on appeal. (*Reid*, 50 Cal.4th at pp. 531–532.)

#### a. 2014 Project Document

The City objected to portions of the declaration of Christopher R. Ryan, the Suojas' engineering expert, in which he discussed the 2014 project document. Notably, the 2014 project document was proffered not only by the Suojas as exhibit 2D to her index of exhibits but also by Chuluunbat as part of exhibit J to the declaration of her counsel, Anthony. Anthony stated in his declaration that the exhibit J documents were "true and correct cop[ies] of excerpts of documents produced by the City of Walnut Creek in verified responses to requests for production that [Chuluunbat] propounded," and the trial court overruled the City's objections to Anthony's exhibit J.

Citing *Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830 (*Serri*), the City contends Anthony's attempt to authenticate the 2014 project document as a record produced by the City in discovery was "improper[]." We disagree. Documents obtained in discovery from a defendant in response to a request for production of documents may be used to oppose a defense motion for summary judgment. (*Hooked Media Group, Inc. v. Apple Inc.* (2020) 55 Cal.App.5th 323, 338 (*Hooked Media*).) "As with any other fact, the authenticity of a document can be established by circumstantial evidence." (*Ibid.*) Here, Anthony's averment that the 2014 project document was a true and correct copy of a record produced by the City in discovery was sufficient circumstantial evidence of its authenticity. *Serri* is unhelpful to the City, as it "did not hold that an attorney's declaration that documents were obtained through discovery can never suffice for authentication." (*Hooked Media*, at

24

p. 338.) Rather, *Serri* held that handwritten notes within documents produced by the defendants in discovery were not sufficiently authenticated as attributable to one of the defendants. (*Serri*, at p. 855.) That holding has no application here.

Accordingly, we conclude the 2014 project document was properly admitted into evidence.

### b. Ryan's Expert Opinions

The City challenges Ryan's opinions that: (1) the 2014 modification to the Pomar intersection more likely than not increased the likelihood that a driver at the Crossing would believe the Pomar signal controlled their movement; (2) the City should have studied the possible installation of visibility-limited signal heads at Pomar Way; and (3) the City's failure to coordinate the signals at the Crossing and Pomar Way more likely than not contributed to the subject collision. The City argues these opinions are irrelevant, speculative, conclusory, and lacking in evidentiary support. The City further argues that Ryan's opinions are inadmissible to the extent he relies on the inadmissible citizen complaints. We are unpersuaded.

As discussed, "a reasoned explanation required in an expert declaration filed in opposition to a summary judgment motion need not be as detailed or extensive as that required in expert testimony presented in support of a summary judgment motion or at trial." (*Garrett*, *supra*, 214 Cal.App.4th at p. 189.)[3] Liberally construed, Ryan's declaration provided sufficient reasons and evidentiary support for his conclusions. As we discuss more fully below,

---

[3] Any potential disagreement between *Garrett* and *Bozzi v. Nordstrom, Inc.* (2010) 186 Cal.App.4th 755, 761 regarding the applicability of the rule of liberal construction to the admissibility of expert testimony does not affect our analysis, as we conclude the Ryan declaration is admissible without the benefit of the rule of liberal construction.

Ryan based his conclusions on guidance contained in the 1971 edition of the Federal Highway Administration's (FHWA) Manual on Uniform Traffic Control Devices (MUTCD), and the California Department of Transportation's Manual on Uniform Traffic Control Devices (CAMUTCD) regarding traffic signal placement and synchronization; undisputed evidence that visibility-limited signal heads were installed throughout the City; and Ryan's personal observations of the area of the subject accident.

### c. The Suojas' Photograph of Vegetation in Median

It appears the same photograph submitted as exhibit D to Dunlap's declaration and exhibit F to Anthony's declaration was also submitted by the Suojas in their index of exhibits, and it was authenticated by their counsel, Justin McManus, who averred in his declaration that the photograph was produced by the City in discovery. Once again, the City argues based on *Serri* that counsel's declaration was insufficient to authenticate the exhibit, and once again, we reject that argument. (See *Hooked Media*, *supra*, 55 Cal.App.5th at p. 338.)

### C. Dangerous Condition of Public Property

Section 835 of the Government Code (further unspecified statutory references are to this code) states "a public entity is 'liable for injury caused by a dangerous condition of its property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and either:  [¶] (a) A negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or [¶] (b) The public entity had actual or constructive notice of the dangerous condition . . . a sufficient time

26

prior to the injury to have taken measures to protect against the dangerous condition." (*Mixon v. Pacific Gas & Electric Co.* (2012) 207 Cal.App.4th 124, 130–131 (*Mixon*).)

"A '[d]angerous condition' is defined as 'a condition of property that creates a substantial (as distinguished from a minor, trivial or insignificant) risk of injury when such property . . . is used with due care in a manner in which it is reasonably foreseeable that it will be used.' (§ 830, subd. (a).)  The existence of a dangerous condition is ordinarily a question of fact but 'can be decided as a matter of law if reasonable minds can come to only one conclusion.' " (*Cerna v. City of Oakland* (2008) 161 Cal.App.4th 1340, 1347 (*Cerna*).)  "A dangerous condition exists when public property 'is physically damaged, deteriorated, or defective in such a way as to foreseeably endanger those using the property itself,' or possesses physical characteristics in its design, location, features or relationship to its surroundings that endanger users." (*Id.* at pp. 1347–1348.)

"A public entity may be liable for a dangerous condition of public property even where the immediate cause of a plaintiff's injury is a third party's negligent or illegal act," such as a motorist's negligent driving, "if some physical characteristic of the property exposes its users to increased danger from third party negligence or criminality. [Citation.]  But it is insufficient to show only harmful third party conduct, like the conduct of a motorist.  ' "[T]hird party conduct by itself, unrelated to the condition of the property, does not constitute a 'dangerous condition' for which a public entity may be held liable." ' [Citation.]  There must be a defect in the physical condition of the property and that defect must have some causal relationship to the third party conduct that injures the plaintiff.  [Citation.]  '[P]ublic liability lies under section 835 only when a feature of the public property has

27

"increased or intensified" the danger to users from third party conduct.' "
(*Cerna, supra,* 161 Cal.App.4th at p. 1348, citing *Bonanno v. Central Contra
Costa Transit Authority* (2003) 30 Cal.4th 139, 153 (*Bonanno*); see also
*Harland v. State of California* (1977) 75 Cal.App.3d 475, 485 [public entity
"may be held liable if its negligence in maintaining dangerous property and
the negligence of another party *concur as proximate causes* of the injury"].)

With these principles in mind, we turn to the facts and evidence
presented in this case. In support of its summary judgment motion, the City
submitted evidence that the subject accident was caused solely by Suoja's
inattentive driving, unconnected to any condition of public property. As the
City's evidence showed, Bancroft Road is a level and straight street with
multiple traffic signal heads at the Crossing, including a signal over the
number one (left) northbound lane. There is also a white painted crosswalk,
a white limit line 30 feet in front of the crosswalk, and two signs on each side
of the limit line warning motorists to "STOP here on RED." In advance of the
Crossing are two signs warning motorists of a "signal ahead." These features
were all in place at the time of the subject accident, and the City submitted
photographs of the Crossing to show they were visible from the road.

Supporting the inference that the traffic signals were visible at the
Crossing was the evidence that just before the subject accident, two vehicles
had slowed or stopped in the number two (right) lane of Bancroft Road at the
Crossing. Additionally, the City's engineering expert, Engelman, opined that
the traffic signal heads at the Crossing were "clearly visible to drivers
approaching the signal from the south," and that "[t]he signal indications for
the Pomar Way intersection do not appear as confusing to motorists at the
subject location."

28

The City also submitted evidence that in the five-year period prior to the subject accident, there was only one collision involving a northbound motorist on Bancroft Road and an eastbound bicyclist at the Crossing. Based on his review of relevant collision reports, Engelman concluded "there was no pattern of accidents substantially similar to the subject accident," and he opined that "[o]ne accident that is similar to the subject accident over the course of several years does not constitute an accident concentration or an accident pattern of significance at the subject location."

Although there was no evidence that Suoja was speeding, under the influence of alcohol or drugs, or otherwise distracted at the time of the subject accident, her mere failure to notice and obey traffic signs and signals and to yield to persons in the crosswalk, without more, constituted a lack of due care. (See *Cerna*, *supra*, 161 Cal.App.4th at p. 1351 ["drivers of vehicles are required to yield the right-of-way to pedestrians in any marked crosswalk"]; see Veh. Code, § 21453, subd. (a) [must stop for a red light].) "The City is not liable for that conduct." (*Chowdhury v. City of Los Angeles* (1995) 38 Cal.App.4th 1187, 1196 (*Chowdhury*) [four-way stop was not inherently dangerous condition when used with due care].)

Based on the foregoing, we conclude the City met its burden of presenting evidence establishing that the accident that injured Oyuntseren was caused by Suoja's failure to exercise due care in observing and obeying traffic signals and markings at the Crossing, not by a dangerous condition of public property. Thus, the burden shifted to Chuluunbat and the Suojas to produce evidence showing a triable issue of material fact that a dangerous condition of public property existed at the Crossing. (*Leyva v. Garcia* (2018) 20 Cal.App.5th 1095, 1105.)

The alleged dangerous condition in this case involves an " 'amalgam' of factors." (*Salas v. Cal Dept of Transp.* (2011) 198 Cal.App.4th 1058, 1069 (*Salas*).) That is, Chuluunbat claims the City's extension of the signal arm at Pomar Way in 2014 "created a new kind of signal confusion vis-à-vis the Crossing and Pomar," and that this, along with the City's failures to synchronize these closely-spaced signals, to utilize visibility-limited signal faces at those locations, and to trim overgrown vegetation in the median of Bancroft Road, combined to increase or intensify the risk of harm to pedestrians and bicyclists in the Crossing. (See *Washington v. City and County of San Francisco* (1990) 219 Cal.App.3d 1531, 1537–1538 [viable dangerous condition claim based on evidence of "vision limitations" from pillars and shadows of freeway overpass].)

In support, appellants submit declarations from their engineering experts opining that the proximity of the unsynchronized traffic signals at Pomar Way and the Crossing increased the likelihood that drivers could become confused as to which signal controlled the Crossing. The experts rely on portions of the FHWA's MUTCD and similar language in the CAMUTCD stating that "[t]raffic control signals within one-half of a mile (2,640 feet) of one another along a major route . . . should be operated in coordination, preferably with interconnected controllers." They also rely on the 2014 CAMUTCD, which provides that "[s]pecial signal faces, such as visibility-limited signal faces, may be used such that the road user does not see signal indications intended for other approaches before seeing the signal indications for their own approach, if simultaneous viewing of both signal indications could cause the road user to be misdirected." Appellants contend that despite these "industry standards," the City failed to coordinate or limit the visibility

30

of the signals in question even though are only approximately 300 feet apart, significantly less than the 2,640 feet recommended by the MUTCD.

As the City points out, the manuals are expressly "not a substitute for engineering judgment" and do not set forth "legal requirement[s] for installation" of traffic signals. (See *Thimon v. City of Newark* (2020) 44 Cal.App.5th 745, 759 (*Thimon*) [Caltrans traffic manual provided only " 'general guidance' " and did not create triable issue regarding dangerousness of crosswalk].) Thus, the MUTCD's assertion that traffic control signals within one-half mile "should" be operated in coordination is not to be understood as a requirement. The 2014 CAMUTCD's statement that visibility-limited signal faces "may" be used to prevent a road user from seeing signal indications intended for other approaches is merely permissive on its face.

That said, we believe the manuals and the experts' reliance thereon lend some credence to the premise underlying appellants' liability theory that there are recognized safety concerns related to the placement of traffic control signals in close proximity, particularly if a motorist becomes exposed to multiple conflicting signal indications at once. Additionally, there was evidence in the record of a report by the National Cooperative Highway Research Program correlating the appropriate spacing of traffic control signals with various speed limits and signal cycle lengths. According to this report, the "[o]ptimum" spacing for signals in a 40 mile per hour zone is 2,930 feet for a signal cycle length of 100 seconds, and 1,760 feet for a signal cycle length of 60 seconds. While we are not aware of any evidence of signal cycle lengths for the Crossing and Pomar Way, the spacing between these signals —roughly 300 feet—was far shorter than what is considered optimal for a 40-mile-per-hour street like Bancroft Road. On this record, the liability theory is

31

sufficiently tied to physical characteristics of property that allegedly increased the dangers of third-party negligence. (*Cerna, supra,* 161 Cal.App.4th at p. 1348.)

The record indicates Engelman opined it is not uncommon for multiple signalized intersections to be in close proximity in urban areas. He did not, however, specify what constitutes "close proximity" or address whether the speed limit would impact his general observation, particularly for a 40-mile-per-hour zone with unsynchronized signals spaced only 300 feet apart. And though Engelman offered his conclusion about what is common in "urban" areas, the record reflects that one of the City's own records described the area in question as "Suburban." Thus, to the extent Engelman was basing his opinion on assumptions about population density and foot traffic in urban cities, those assumptions may not apply here.

Moreover, even accepting that the federal MUTCD and CAMUTCD call for public entities to make independent engineering decisions about traffic signal placement and the use of visibility-limited signal faces based on available evidence and field data, there was admissible evidence in the record that the City possessed specific information regarding signal visibility problems in the area of the subject accident. Accordingly, a trier of fact could potentially conclude this information should have informed the City's exercise of engineering judgment in conjunction with MUTCD and CAMUTCD guidelines.

For instance, in 2014, the City made modifications to the traffic signal at Pomar Way due to problems of signal visibility for northbound motorists on Bancroft Road. The City acknowledged that green lights at Treat Boulevard were "over shadow[ing]" the red lights at Pomar Way, causing motorists to drive through the Pomar intersection on a red light. City

32

Engineer Raie confirmed this phenomenon during his deposition and acknowledged there were " 'several broadside crashes here over the years' " due to traffic signal "visibility" issues.

The City insists this evidence is irrelevant because the layout, signal configuration, and traffic issues at the Crossing and Pomar Way are different from those at Treat Boulevard and Pomar Way. We acknowledge there are differences. Prior to the 2014 modification of the Pomar intersection, the traffic signal arm at Pomar Way did not extend over to the number one (left) northbound lane of Bancroft Road. In contrast, at the time of the subject accident, there was a signal directly above the number one lane of Bancroft Road in the approach to the Crossing.

Nonetheless, there are countervailing reasons why this distinction is not dispositive on summary judgment. First, the distance between Pomar Way and Treat Boulevard (approximately 580 feet) is considerably longer than the distance between the Crossing and Pomar Way (approximately 320 feet). A trier of fact could, weighing all the evidence, potentially conclude that the type of signal confusion problem acknowledged to exist between Pomar Way and Treat Boulevard prior to the 2014 modifications might stand to be worse between the Crossing and Pomar Way due to the considerably shorter distance between the latter two.

Second, the 2014 project document recommended not only extending the signal arm at Pomar Way but installing visibility-limited signal faces at Treat Boulevard so that northbound motorists approaching Pomar Way would not see the lights at Treat Boulevard. From this, a trier of fact could infer the City's acknowledgment that extending the signal arm to the number one lane was insufficient to remedy the signal visibility problem. Meanwhile, the evidence that the City installed visibility-limited signal faces in the

33

southbound direction at the Crossing and at several other locations throughout the City suggests the visibility problem discussed in the 2014 project document was not at all peculiar to Treat Boulevard.

In addition to the City's acknowledgment of visibility problems related to signal proximity along this stretch of road, there was also evidence of red light violations at the Crossing captured on video in September 2014. Although the ATD video is not in the record, Engelman acknowledged that "two vehicles . . . crossed the crosswalk after the signal turned red," while an additional 10 vehicles moved past the initial white limit line on a red light.[4]

The trial court concluded that even if the ATD video showed multiple red light violations, "there is no evidence that is a significant rate, nor is there evidence establishing what caused the two cars to run the red light. In particular, there is no evidence linking those events to the traffic lights at Pomar Way." The court further remarked that "given the volume of traffic in the area, that was not a particularly persuasive number." As previously discussed however, the court sustained the objection to Engelman's assertion that 1,766 vehicles passed through the Crossing during the ATD video, and the court erroneously overruled the objection to Engelman's 20.8 million figure regarding annual traffic flow at the Crossing. Consequently, there was no admissible evidence of traffic volume in the area for comparative purposes.

---

[4]     The trial court found that "the significance of the report is brought into question" due to a "discrepancy in how cars were counted as having run the red light." Specifically, the record contains a "Municipal Service Request" dated September 17, 2014, stating that "[u]pon reviewing the videos ATD submitted, the logic they used to define a red light violation was invalid. ATD re-reviewed the videos and noted that there were zero red light violation[s]." Nevertheless, Raie acknowledged at his deposition in December 2021 that "12 people . . . ran the red light," and Engelman corroborated at least two of these instances. At bottom, the precise number of red light violations in the video was in dispute.

34

Moreover, in concluding the evidence of red light violations was insignificant and unpersuasive, the trial court improperly weighed the evidence and failed to liberally construe it in Chuluunbat's favor. Indeed, the court's downplaying the significance of this evidence stood in contrast to the testimony of the City's own engineer, Raie, that the video of red light violations was a "major concern" to the City. The evidence also showed that as a direct response to the ATD video, several proposals were made "to increase visibility for this location," thereby supporting the inference that the red light violations were linked to issues with signal "visibility" in the area. Viewed through the lens of liberal construction, the record reflects the City obtained video evidence of multiple red light violations at the Crossing in a random three-hour time period on a Saturday morning, shortly after receiving McVey's complaint of multiple red light violations at the same location, which tended to support the existence of a signal visibility problem at the Crossing similar to the one the City had previously acknowledged to exist just down the road.

There was also evidence of a prior accident in 2016 that was virtually identical to the subject accident. Like Suoja, the motorist in the April 2016 accident claimed to have been confused by the cluster of traffic signals in the area and focused on the green signal at Pomar Way rather than the red signal at the Crossing. From this and the other evidence discussed, a trier of fact could infer a causal link between the red light violations at the Crossing and the abundance of unsynchronized traffic control signals in the area.

To provide visual support for her claims, Chuluunbat submitted photographs taken by commercial photographer Sam Sargent of the northbound approach to the Crossing on Bancroft Road, as well as the aforementioned photograph of the median taken on the day of the subject

35

collision.  In comparison to the City's photographs of the Crossing, Sargent's photographs offered a very different perspective of Bancroft Road which showed that the traffic signals between the Crossing and Pomar Way appear relatively close in size and clustered together in the same general line of sight.  Where, as here, reasonable minds may differ as to whether a photograph depicts a dangerous condition of property, a question for the trier of fact is at issue.  (See *Kasparian v. AvalonBay Communities, Inc.* (2006) 156 Cal.App.4th 11, 26 (*Kasparian*).)

As for the photograph of the median, the trial court remarked, it "didn't look like [the vegetation] obstructed."  We think reasonable minds may differ when considering all of the evidence.  Indeed, in the City's own photograph of the median, the vegetation appears to be nearly the same height as a bicyclist stopped before the Crossing on the southbound side of Bancroft Road.  On this record, the photographic evidence presented a question for the trier of fact.  (*Kasparian, supra*, 156 Cal.App.4th at p. 26.)

Relying on *Sun v. City of Oakland* (2008) 166 Cal.App.4th 1177 (*Sun*), *Chowdhury, supra*, 38 Cal.App.4th at p. 1196, and the statutory definition of "dangerous condition" (§ 830, subd. (a)), the City argues that "property is not 'dangerous' if the risk of harm is created only when foreseeable users fail to exercise due care."  From this, the City maintains that because no reasonably attentive driver would have run the red light at the Crossing, the property was not "dangerous" within the meaning of section 830, and the City therefore bears no liability for plaintiff's injuries.  But as acknowledged by the court in *Sun*, as well as by the City in this case, the specific test formulated by the Supreme Court for public entity liability in cases involving third party negligence is whether there was some defect in the physical condition of the property that had a "causal connection" to or that "increased

36

or intensified" the dangers of the third party's conduct. (*Bonanno*, *supra*, 161 Cal.App.4th at pp. 155, 161 [location of bus stop that enticed patrons to cross busy and uncontrolled intersection constituted dangerous condition]; see *Sun*, at pp. 1187, 1190 [while bulb-outs invited heavier pedestrian use of crosswalk, such use did not increase or intensify danger to plaintiff].)  For the reasons discussed, a triable issue of material fact exists as to whether a physical condition of the property in question—e.g., the close proximity of traffic signals between the Crossing and Pomar Way—increased or intensified the risk that a third party motorist like Suoja would become confused as to the controlling signal and run the red light.

The City insists that notwithstanding any possible confusion over the controlling traffic signal, the signage on the approach to the Crossing adequately warned motorists of the crosswalk and signal ahead such that a motorist exercising due care would avoid an accident like the one in this case. We do not find these indicators to foreclose a dangerous condition claim as a matter of law.  As Ryan opined, "The addition of W3-3 signal ahead warning signs, would not necessarily warn a driver that the signal at Pomar Way was the wrong signal to be looking towards."  Assuming the viability of the signal confusion theory, a trier of fact could conclude that the signs warning of a "signal ahead" or the need to stop "ON RED" were effectively overridden by a reasonably mistaken belief that the controlling signal was green.

Likewise, the evidence of the two other cars stopped in the number two lane at the Crossing just prior to the subject accident does not establish that the dangerous condition claim lacks merit as a matter of law.  Under a liberal construction of the evidence, the likelihood of signal confusion might be more pronounced in the number one lane (in which Suoja traveled), whereas the number two lane at the Crossing had the benefit of an additional signal to its

37

right that may have helped reinforce the awareness of the motorists in that lane.

In sum, the picture that emerged from appellants' evidence, when viewed in accordance with the rule of liberal construction, was that the subject accident occurred along a stretch of road that had known signal visibility problems for motorists due to the close proximity of the traffic signals in the area, and where multiple red light violations and a virtually identical vehicle-to-bicyclist collision based on a claim of signal confusion had occurred within the previous five years. A trier of fact could find that in light of this evidence, the City's failure to synchronize the signals and/or use visibility-limited signal faces increased or intensified the risk that a motorist traveling northbound on Bancroft Road would mistake a green light at Pomar Way as the controlling signal for the Crossing and drive through a red light. The trier of fact could further conclude that the resulting danger to users of the Crossing was compounded by the City's failure to trim overgrown vegetation in the median that obscured the presence of the pedestrians from the motorists' view.

The City places heavy emphasis on the lack of prior similar accidents at the Crossing and the resulting inference that drivers exercising due care would not have caused such an accident. We acknowledge the decisions holding that the absence of prior similar accidents at the site of an alleged dangerous condition may support an inference that the substantial risk requirement of section 830, subdivision (a), cannot be met. (See *Thimon, supra,* 44 Cal.App.5th at p. 764 [no similar collisions over 10 years preceding accident "during which tens of millions of vehicles passed through this intersection"]; *Mixon, supra,* 207 Cal.App.4th at p. 138 [one similar accident at intersection where it was undisputed traffic volume was between 7,700

and 9,500 vehicles per day]; *Salas*, *supra*, 198 Cal.App.4th at pp. 1064, 1071 [no other collisions involving pedestrians at intersection in prior 10 years despite 30 million vehicles having passed through].)

But in none of these cases was the absence of prior similar accidents a decisive, let alone dispositive, factor in affirming summary judgment for the public entity. In *Mixon*, the reviewing court first addressed each of the physical characteristics of the intersection (e.g., dim lighting, lack of traffic control signal, lack of pedestrian crossing sign, "minimalist" parallel crosswalk lines, downgrade in road) and concluded none of those features, alone or in combination, created a substantial risk of injury. (*Mixon*, *supra*, 207 Cal.App.4th at pp. 132–138.) Only then did the court remark that the evidence of a single similar accident at the subject accident location "does not prove a dangerous condition, given the high traffic volume that has passed through the intersection without incident." (*Id.* at p. 138; see also *Thimon*, *supra*, 44 Cal.App.5th at p. 756 [describing features of intersection and driver's own negligence before noting absence of prior similar accidents]; *Salas*, *supra*, 198 CaApp.4th at p. 1071 [acknowledging that absence of prior similar collisions was "not dispositive on the issue of dangerousness"].)

Moreover, none of these cases involved circumstances where, as here, the public entity acknowledged a prior traffic safety problem that occurred in the same vicinity as the plaintiff's accident and that closely mirrored the plaintiff's dangerous condition theory. This sets the instant matter distinctly apart from the cases relied upon by the City. (See *Salas*, *supra*, 198 Cal.App.4th at p. 1069 ["no hard-and-fast rule" as to what constitutes dangerous condition, and "each case must depend upon its own facts"].)

We also note that to the extent courts have found the absence of prior similar accidents to be material, such courts were conducting comparative

assessments based on evidence of traffic volume successfully admitted into the record. (See *Thimon, supra,* 44 Cal.App.5th at p. 764, fn. 9 [estimate of 80 million vehicles passing through intersection was established through "[p]laintiff's expert's review of citywide speed studies"]; *Mixon, supra,* 207 Cal.App.4th at p. 138 [evidence of high traffic volume at subject accident location was "undisputed"]; *Salas, supra,* 198 Cal.App.4th at p. 1071 [no mention of challenge to admissibility of evidence that 30 million vehicles passed through intersection].) As already discussed, the record here lacks admissible evidence of traffic volume through the Crossing for a given time period, as the City's various estimates were inadmissible.

The City maintains that traffic volume at the Crossing was sufficiently established through a January 2020 "Engineering and Traffic Survey" submitted with the moving papers. Strictly construed, however, the evidence fails to assist the City. Although the survey found an average daily traffic volume of 29,800 vehicles on Bancroft Road from Treat Boulevard to Ygnacio Valley Road, this calculation was based on a mere 104 "Vehicles Sampled," and nothing in the survey or the City's briefing or evidence explains the methodology used to arrive at the total daily figure. Furthermore, the survey pertains to the entire segment of road between Treat Boulevard and Ygnacio Valley Road, but the City provides no means from which to extrapolate only northbound traffic volume at the Crossing or infer that traffic volume on Bancroft Road remains wholly consistent along this entire segment of road. Resolving all doubts against the City, we conclude the January 2020 traffic survey was insufficient to demonstrate northbound traffic volume on Bancroft Road at the Crossing.[5]

---

[5] The January 2020 survey undermines the City's positions in other respects. As previously discussed, Engelman's opinion that it is common for

Furthermore, and in any event, the absence or paucity of prior similar accidents, though " 'relevant to the determination of whether a condition is dangerous,' " is not "*dispositive* of whether a condition is dangerous," nor does it "compel[] a finding of nondangerousness absent other evidence." (*Lane v. City of Sacramento* (2010) 183 Cal.App.4th 1337, 1346; see also *Kim v. County of Monterey* (2019) 43 Cal.App.5th 312, 331 [rejecting " 'paucity of accidents' " argument in reversing summary judgment on claim for dangerous condition of public property]; *Salas*, *supra*, 198 Cal.App.4th at p. 1071 [evidence of no prior similar collisions is relevant but not dispositive on issue of dangerousness].)

Finally, the City stresses it was "not required to go beyond the elimination of danger and maximize every safety precaution." (*Mixon*, *supra*, 207 Cal.App.4th at p. 136.) But given the instant record, we conclude it is for a trier of fact to determine whether the synchronization of signals at the Crossing and Pomar Way, use of visibility-limited signal faces, and trimming of vegetation in the median at the Crossing were merely additional safeguards the City could but was not required to take, or whether these measures were necessary to eliminate a condition that increased or intensified the risk of harm to pedestrians and bicyclists at the Crossing. (*Cerna*, *supra*, 161 Cal.App.4th at p. 1348.)

---

traffic signals to be in close proximity in "urban" areas appears inapplicable given the January 2020 survey's description of the area in question as "Suburban." Additionally, the survey indicates that one of the "Conditions Not Readily Apparent to the Driver" in the surveyed area is that "[t]he Contra Costa Canal Trail Crossing is located along this segment." The acknowledgment that the Crossing was "[n]ot [r]eadily [a]pparent" to motorists on Bancroft Road, notwithstanding the traffic signals, signs, and markings in the area, tends to reinforce Chuluunbat's dangerous condition theory in this case.

In sum, we conclude the trial court erred in concluding there were no triable issues of material fact as to the existence of a dangerous condition of public property at the Crossing.

### D. Design Immunity

A public entity may avoid liability for a dangerous condition of public property by raising the affirmative defense of design immunity. (§ 830.6.) Design immunity has three elements: "(1) a causal relationship between the plan or design and the accident; (2) discretionary approval of the plan or design prior to construction; and (3) substantial evidence supporting the reasonableness of the plan or design." (*Cornette v. Department of Transportation* (2001) 26 Cal.4th 63, 66 (*Cornette*).) While the third element "must be tried by the court" (*id.* at p. 66), the elements of causation and discretionary approval "may only be resolved as issues of law if the facts are undisputed" (*Grenier v. City of Irwindale* (1997) 57 Cal.App.4th 931, 940).

Because the only element in dispute here is causation, the City contends it is entitled to design immunity as a matter of law because Chuluunbat's claim based on signal confusion results from two features—placement and location of the signals—that were necessarily contemplated in the 1992 designs for improving Bancroft Road.

Chuluunbat responds that the City's contention "contradicts" *Cameron v. State* (1972) 7 Cal.3d 318 (*Cameron*), where the Supreme Court reversed a judgment of nonsuit for the State in a case alleging a dangerous "superelevation" on a curve in the road. (*Cameron*, at p. 323.) Because the State's approved plan for the highway "contained no mention of superelevation intended or recommended," the high court reasoned that "such superelevation as was constructed did not result from the design or plan . . . and there was no basis for concluding that any liability for injuries caused by

42

this uneven superelevation was immunized by section 830.6." (*Cameron*, at p. 326.) Chuluunbat argues that, like the public entity in *Cameron*, the City is not entitled to immunity because it failed to demonstrate that the 1992 designs considered any signal confusion between the Crossing and the extended signal arm at Pomar Way.

The City "struggle[s] to make sense of" Chuluunbat's argument because "appellants themselves argue there was no 'issue' with signal confusion until 2014, over 20 years *after* the Crossing plans were approved." But this point cuts both ways. Since the claim here is that the signal confusion was created in 2014 by the City's extension of the signal arm at Pomar Way, it cannot be said the claim is related to any design decisions about signal placement and visibility actually contemplated in 1992.

Given the chronology of events, we believe the more apt question is whether any immunity from the 1992 designs was lost. A plaintiff may demonstrate the loss of design immunity by establishing that "(1) the plan or design has become dangerous because of a change in physical conditions; (2) the public entity had actual or constructive notice of the dangerous condition thus created; and (3) the public entity had a reasonable time to obtain the funds and carry out the necessary remedial work to bring the property back into conformity with a reasonable design or plan, or the public entity, unable to remedy the condition due to practical impossibility or lack of funds, had not reasonably attempted to provide adequate warnings." (*Cornette*, *supra*, 26 Cal.4th at p. 66.) "[W]here triable issues of material fact are presented, . . . a plaintiff has a right to a jury trial as to the issues involved in loss of design immunity." (*Ibid.*)

We conclude there are triable issues of material fact as to whether the City lost any immunity from the 1992 designs due to changes in the physical

conditions of Bancroft Road.  Although we are unaware of any evidence in the record describing the condition (or even existence) of a traffic signal at Pomar Way in 1992, we must assume, resolving all doubts against the City, that any such signal was on the shorter, 30-foot arm that did not extend to the number one lane of Bancroft Road.  As such, any decisions in 1992 regarding the placement of traffic signals at the Crossing only contemplated the interaction between those signals and the shorter arm at Pomar Way.  The 2014 modifications to Pomar Way—in particular the extension of the signal arm to 50 feet—was a change in the physical condition of the road that allegedly caused the Pomar Way signal to become dangerously visible to motorists approaching the Crossing in the number one lane of Bancroft Road, and there was evidence the City never considered the impact of the 2014 modification to Pomar Way on the signal at the Crossing.  Additionally, the overgrown vegetation in the median of Bancroft Road was a changed condition that allegedly contributed to the dangerous condition of the Crossing for users of the crosswalk.

The evidence also supported the second and third elements of lost design immunity.  The City had actual notice of multiple red light violations at the Crossing from 2014 and received citizen complaints in 2014 and 2018 that drivers were "confused with all the stoplights at the next location across from Pomar way@ Countrywood"; that there was "poor visibility of the red light over the Trail . . . in the North Bound direction"; and that "very dangerous" plants in the median of Bancroft Road required maintenance. The City does not contend it lacked a reasonable time to obtain necessary funds and carry out remedial work at the Crossing.  (*Cornette*, *supra*, 26 Cal.4th at p. 66.)  Indeed, the City retained Kimley-Horn in 2018 to study traffic signal visibility, and there is no indication in the record that the study

44

was unfinished due to a lack of funding. Additionally, there was evidence that visibility-limited signal heads are not expensive or complicated to install, and that they have been utilized throughout the City since 1974. A trier of fact could conclude from the totality of the evidence that the City knew of and had the time and resources to remedy the changed physical conditions that allegedly created a dangerous condition at the Crossing.

For these reasons, we conclude the trial court properly denied the City's motion for summary adjudication on its affirmative defense of design immunity.

### E. Trail Immunity

"A public entity . . . is not liable for an injury caused by a condition of: [¶] (a) Any unpaved road which provides access to fishing, hunting, camping, hiking, riding, including animal and all types of vehicular riding, water sports, recreational or scenic areas and which is not a (1) city street or highway or (2) county, state or federal highway or (3) public street or highway of a joint highway district, boulevard district, bridge and highway district or similar district formed for the improvement or building of public streets or highways. [¶] (b) Any trail used for the above purposes." (§ 831.4, subds. (a), (b).)

Whether property constitutes a "trail" for purposes of section 831.4 "depends on a number of considerations, including accepted definitions of the property [citations], the purpose for which the property is designed and used, and the purpose of the immunity statute." (*Amberger-Warren v. City of Piedmont* (2006) 143 Cal.App.4th 1074, 1078–1079 (*Amberger-Warren*).) It is the "design and use" of property, "not the name," that will control whether it is a "trail" for purposes of immunity. (*Farnham v. City of L.A.* (1998) 68 Cal.App.4th 1097, 1103.)

45

The purpose of the immunity afforded under section 831.4 is " 'to encourage public entities to open their property for public recreational use, because "the burden and expense of putting such property in a safe condition and the expense of defending claims for injuries would probably cause many public entities to close such areas to public use." ' [Citation.] The trail immunity provided in subdivision (b) of the statute extends to trails that are used for the activities listed in subdivision (a), and to trails that are used solely for access to such activities. [Citation.] The immunity applies whether or not the trail is paved." (*Amberger-Warren*, *supra*, 143 Cal.App.4th at p. 1078.) " '[T]o fulfill its purpose, trail immunity must extend to claims arising from the design of a trail, as well as its maintenance.' [Citations.] '[L]ocation, no less than design, is an integral feature of a trail, and both must be immunized for the same reasons.' [Citation.] This immunity is absolute." (*Leyva v. Crockett & Co.* (2017) 7 Cal.App.5th 1105, 1109 (*Leyva*).)

"The purpose for which a trail is used is ordinarily viewed as a factual issue, but it becomes a question of law if only one conclusion is possible." (*Armenio v. County of San Mateo* (1994) 28 Cal.App.4th 413, 418.)

In this case, the subject accident occurred in the crosswalk of Bancroft Road, a multi-lane street open to the public for purposes of vehicular travel. Under "accepted definitions" applicable to this property (*Amberger-Warren*, *supra*, 143 Cal.App.4th at pp. 1078–1079), the Crossing is appropriately defined not as a "trail" but as a "crosswalk" on a city "street" or "roadway." (See Veh. Code, §§ 275, subd. (b) [defining "crosswalk" as "[a]ny portion of a roadway distinctly indicated for pedestrian crossing by lines or other markings on the surface"], 530 [defining "roadway" as "that portion of a highway improved, designed, or ordinarily used for vehicular travel"], 590

46

[defining "street" as "a way or place of whatever nature, publicly maintained and open to the use of the public for purposes of vehicular travel"].)

The City maintains the Crossing is appropriately viewed as part of a trail and purports to quote the following from *Hartt v. County of Los Angeles* (2011) 197 Cal.App.4th 1391 (*Hartt*): " 'A trail does not cease to become a trail because . . . there is cross traffic.  To find otherwise would seriously undercut the purposes of section 831.4 to hold public entities immune so that they won't close recreational trails.' "  However, no such language appears in *Hartt*, nor does the decision's actual holding support the City's claim of trail immunity here.

*Hartt* involved a fatal accident involving a bicyclist and a truck in a park "on a road which connects the upper and lower areas of the park." (*Hartt*, *supra*, 197 Cal.App.4th at p. 1393.)  The driver, a park maintenance worker, was operating the truck in the course and scope of his employment, and the road on which the accident occurred was "a recreational trail . . . for park visitors." (*Id.* at pp. 1393, 1402).  It was "not a dedicated street or highway, it [was] closed to through traffic, and it [was] used intermittently by park vehicles," as "[t]here [were] no other ways for park maintenance workers to go back and forth through the park other than by traveling on the park trail." (*Id.* at p. 1402.)  On these facts, the *Hartt* court concluded the "dual or mixed use" of the trail for recreational purposes and maintenance access did not circumvent the immunity provided by section 831.4. (*Id.* at p. 1400.)  Here, in contrast, the subject accident did not occur on a road located within the boundaries of a park that is used for recreation and maintenance access but is otherwise closed to through traffic.  To the contrary, it occurred in the crosswalk of a public street that is open to the public for vehicular travel.

We next examine the purposes for which the property in question was designed and used. (*Amberger-Warren*, *supra*, 143 Cal.App.4th at p. 1079.) For trail immunity purposes, the activities listed in section 831.4, subdivision (a), and incorporated by reference into subdivision (b), are as follows: "fishing, hunting, camping, hiking, riding, including animal and all types of vehicular riding, water sports, recreational or scenic areas." (§ 831.4, subd. (a).) We see no evidence that the Crossing was designed and used for such purposes. To the contrary, it appears the primary design and use of the Crossing is to provide safe access across Bancroft Road for members of the general public, including schoolchildren, parents, and staff to and from nearby Bancroft Elementary School. That the Crossing also provides a means for Trail users to connect from one side of the Trail to the other is insufficient, as the salient consideration for access-trail immunity purposes is whether the property is used "solely for access to" the activities set forth in section 831.4, subdivision (a). (*Amberger-Warren*, at p. 1078.)

Likewise, the evidence does not support the City's assertion that the purpose of section 831.4—to encourage public entities to keep their property open for public recreational use—would be furthered by granting the City immunity in this case. (*Amberger-Warren*, *supra*, 143 Cal.App.4th at p. 1079.) It is undisputed that the East Bay Regional Park District operates and controls the Trail, while the City controls and maintains the Crossing. As such, we see no basis for concluding that placing the burden and expense on the City to keep the Crossing in a safe condition and defend claims for injuries would impact the East Bay Regional Park District's operation of the Trail.

Finally, the City argues it is entitled to trail immunity because the Crossing and its traffic signals are "integral" features of the Trail, as they are

48

conditions related to the Trail's design, location, and maintenance. We acknowledge that courts have granted public entities immunity from claims alleging a dangerous condition arising from a trail's "location" or other "integral" features. (See *Amberger-Warren*, *supra*, 143 Cal.App.4th at p. 1085 [trail's location across hill where injury took place was encompassed within section 831.4 because "location, no less than design, is an integral feature of a trail, and both must be immunized"]; *Leyva*, *supra*, 7 Cal.App.5th at p. 1107 [trail's location next to golf club was integral feature of trail]; *Prokop v. City of Los Angeles* (2007) 150 Cal.App.4th 1332, 1342 [gateway on bike path was integral part of bike path].) However, as other courts have clarified, this rationale applies only where the feature is "related entirely to the existence of the trail—if the trail did not exist, the dangerous condition would not have existed." (*Reed v. City of Los Angeles* (2020) 45 Cal.App.5th 979, 983 (*Reed*).)

Two cases illustrate this point. In *Garcia v. American Golf Corp.* (2017) 11 Cal.App.5th 532, the minor plaintiff was struck by a golf ball while being pushed in a stroller on a pedestrian walkway in the Rose Bowl Loop (Loop), which is "comprised of roadways . . . that encircle[d] the Rose Bowl Stadium and the Brookside Golf Course" and provided access to these and other recreational areas. (*Id.* at p. 536.) Presuming the walkway was a "trail" for purposes of 831.4, *Garcia* nevertheless held that trail immunity did not apply because "it is the Loop, of which the walkway is only a small part, that provides access to the golf course. If the walkway was eliminated—if the area it occupies was merged into part of the street or turned into a sidewalk—the Loop would still provide access to the golf course," and thus, "the danger posed by the Brookside Golf Course would exist even if the walkway did not; there would still be a danger of errant golf balls hitting motorists and recreational users of the Loop." (*Id.* at pp. 545–546.)

49

In *Toeppe v. City of San Diego* (2017) 13 Cal.App.5th 921, the plaintiff was walking on a pathway through a public park when a branch from a negligently maintained tree fell and struck her. (*Id.* at p. 924.) *Toeppe* held that trail immunity did not apply because "unlike the dangerous condition of a hill in *Amberger-Warren* that could not be separated from the subject path, here, the dangerous condition (a negligently maintained eucalyptus tree) is independent of the trail through Mission Bay Park. It is possible for a visitor to the park to be injured by a falling tree whether she used the trail or simply walked across the grass and was struck by a falling branch." (*Id.* at p. 928.) The court further noted that "the dangerous condition does not require the City to improve the trail or alter its design whatsoever. . . . Indeed, Toeppe's claim of a dangerous condition does not involve the trail whatsoever." (*Id.* at p. 929.)

Similarly, the dangerous condition alleged in this case is not "related entirely to the existence of the" Trail such that if Trail did not exist, the dangerous condition would not exist. (*Reed*, *supra*, 45 Cal.App.5th at p. 983.) The alleged condition may affect any person using the Crossing to traverse Bancroft Road, not just those hiking or biking along the Trail, and Chuluunbat's claim does not call for any improvements to the Trail itself, but rather, to the signals at the Crossing and Pomar Way. Accordingly, the Crossing is not an integral feature of the Trail that calls for granting trail immunity for the dangerous condition claim alleged in this case.

In sum, the trial court properly denied the City's motion for summary adjudication on its affirmative defense of trail immunity.

**DISPOSITION**

The judgment is reversed with directions to vacate the order granting summary judgment and to enter a new order denying summary judgment. Appellants are entitled to their costs on appeal.

_____

Fujisaki, J.

WE CONCUR:

_____

Tucher, P.J.

_____

Petrou, J.

*Chuluunbat v. Suoja* (A167310)

51